**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

YOLANDA YOUNG,               )
                                 )
        Plaintiff,           )
                                 )
      v.                     )      Civil Action No. 09-0464 (RBW)
                                 )
COVINGTON & BURLING LLP,    )
                                 )
        Defendants.     )

**FIRST AMENDED COMPLAINT**

1.     Through its pattern and practice, Defendant, Covington & Burling LLP, systematically relegates its black attorneys to its lowest rung of practicing attorneys—the position of staff attorney. Firm policy bans the promotion of staff attorneys to the position of associate and, ultimately, to partner. This prohibition adversely impacts Defendant's black attorneys by consigning their majority to earning less money, performing less challenging work, and enjoying less opportunity for professional growth than Defendant's nonblack attorneys.

2.     Plaintiff, Yolanda Young, complained to Defendant about its ghettoization of black attorneys, about her white coworkers' use of racial slurs in the workplace, and about the favoritism those same coworkers received from her managers. The law firm responded to her report of this illegal behavior with dismissive comments, false accusations, and intense scrutiny of her work. Despite her seniority and productivity, her managers eventually found reasons, however implausible, to fire her.

3.     Defendant's retaliatory termination of Plaintiff compelled her to inform the public of the law firm's brazen discrimination. She learned soon after her article was published that Defendant had rehired some of the terminated staff attorneys. So, needing

the money more than needing to be right, she reapplied for her old job. Defendant refused to rehire her because, as it later admitted, she had exercised free speech by writing the article.

4.     Plaintiff lodged this complaint to vindicate her rights under Title VII, 42 U.S.C. § 1981, the District of Columbia Human Rights Act, and common law. She seeks injunctive and monetary damages on her behalf and on behalf other similarly situated staff attorneys for discriminatory job-assignment and nonpromotion (Count I), the adverse impact of the job-assignment and nonpromotion policies on black staff attorneys (Count II), severe and pervasive workplace harassment (Count III), retaliation against Plaintiff for her opposition to discrimination (Count IV), wrongful termination of Plaintiff (Count V), subterfuge in retaliating against and terminating Plaintiff (Count VI), and negligent supervision of the head of the staff-attorney program (Count VII). On each of these claims, Plaintiff demands a jury trial.

## I.     <u>JURISDICTION AND VENUE</u>

5.     This court has original subject-matter jurisdiction over this matter.

6.     Venue properly lies in this Court because Plaintiff resides in the District of Columbia, Defendant is located in the District of Columbia, and the controversy involves illegal behavior committed by Defendant within the District of Columbia.

## II.    <u>PARTIES</u>

7.     Plaintiff is a black woman residing in the District of Columbia.  Plaintiff was employed as a staff attorney by Defendant from February 2005 to August 2007.

8.     Defendant is a limited liability partnership with its principal place of business located at 1201 Pennsylvania Avenue, N.W., Washington, D.C. 20004. Defendant employed Plaintiff from February 2005 to August 2007.

### III.  **ADMINISTRATIVE PREREQUISITES**

9.      On June 13, 2008, Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission, which she requested be cross-filed with the D.C. Human Rights Commission.

10.     On December 16, 2008, the U.S. Equal Employment Opportunity Commission mailed Plaintiff a notice of her right to sue Defendant for the allegations made in her charge of discrimination.

11.     Within ninety days of receiving that notice, on February 24, 2009, Plaintiff filed suit against Defendant in the Superior Court of the District of Columbia, which exhausted her administrative remedies.

### IV.  **FACTUAL ALLEGATIONS**

12.     Defendant is a law firm. It employs hundreds of lawyers in the United States. It maintains offices in New York, California, and Washington, DC.

13.     Defendant employs its practicing lawyers as partner, counsel, associate, or staff attorney.

14.     Defendant assigns its attorneys to the position of partner, counsel, associate, or staff attorney based on criteria that result in a majority of its black attorneys being assigned to the position of staff attorney.

15.     On information and belief, Defendant relies on job-assignment criteria that are not related to or predictive of job performance. For example, Defendant uses a combination of law school grades, journal membership, and clerkship experience to determine the assignment of its attorneys. Yet, based on information collected from covington.com, Defendant's partners—who decide how an attorney should be assigned—do not all have such credentials, but presumably are able to perform adequately at partner-level:

3

**COMPARISION OF ATTORNEY CREDENTIALS IN WASHINGTON, DC[1]**

| ATTORNEYS | % OF GRADE DISTINCTION | % OF JOURNAL EXPERIENCE | % WITH CLERKSHIP |
|---|---|---|---|
| Partners (122) | 62 | 44 | 55 |
| Counsel (75) | 44 | 44 | 41 |
| Associates (143) | 72 | 66 | 65 |

16.     Black practicing attorneys, as a group, typically graduated from higher ranked law schools than their white colleagues. Using 2007 as an example, this conclusion is supported by data collected from covington.com, the National Association of Law Placement ("NALP"), and *U.S. News & World Report*:

**ATTORNEY LAW SCHOOL RANKINGS IN WASHINGTON, DC**

| ATTORNEYS | MEAN | MEAN EXCLUDING LOW 17% OUTLIERS | MEDIAN |
|---|---|---|---|
| *Partners* | 10 | | 4 |
| White | 10 | | 4 |
| Black | 4 | | 2 |
| | | | |
| *Counsel* | 14 | | 6 |
| White | 14 | | 6 |
| Black | 10 | | 10 |
| | | | |
| *Associates* | 14 | | 9 |
| White | 14 | 10 | 10 |
| Black | 20 | 4 | 4 |
| | | | |
| *Staff Attorneys* | 52 | | 47 |
| White | 66 | | 47 |
| Black | 32 | | 27 |

---

[1] All data compiled in this Complaint is alleged on information and belief and will be evaluated for completeness and accuracy against primary data collected from Defendant through the discovery process.

17.     The raw data for 2007 reflects that the law school rankings of black staff attorneys are more typical of the schools from which Defendant's partners, counsel, and associates graduated than of Defendant's white staff attorneys. It appears that Defendant's job-assignment criteria requires that black staff attorneys graduate from higher ranked schools than its white staff attorneys.

18.     Defendant created the position of staff attorney in 2005. Staff attorneys are licensed, experienced attorneys who perform a host of legal functions. They primarily perform online document review, but they have been used by Defendant in a variety of ways as practicing attorneys. At that time, staff attorneys were paid an annual salary of $65,000. It has since increased.

19.     When the staff-attorney program began, staff attorneys were eligible to be promoted. A promotion meant a more diverse set of legal responsibilities and more money. A staff attorney promoted in 2005, according to data reported by Defendant to NALP, would have nearly doubled her salary as a first-year associate earning an annual $125,000. Associate salaries continue to increase with seniority; staff attorney salaries do not.

20.     Some time in 2005, Defendant promoted two white staff attorneys in its Washington office. It promoted one staff attorney to associate and the other to counsel.

21.     Then, in 2006, Defendant implemented a policy in Washington banning the promotion of all staff attorneys. On information and belief, this policy was not implemented in Defendant's other offices. In addition, Defendant bans no other group of practicing attorneys from promotion.

22.     At the same time the nonpromotion policy took effect, Defendant significantly increased the number of staff attorneys it employed in Washington, which coincided with the largest number of black attorneys it had ever hired.

23.     The number of black attorneys employed by Defendant as practicing attorneys, which includes partners, counsel, associates, and staff attorneys, historically has been less than their proportional representation in the national and local attorney workforces.

24.     According to a demographic study by the American Bar Association based on the 2000 census, less than 5% of licensed lawyers are black and less than 13% are minority.

25.     This number undercounts the percentage of black licensed black attorneys in the statistical metropolitan area of Washington, DC, which is the relevant labor market for Defendant.

26.     Defendant's historical underrepresentation of blacks at the partner, counsel, and associates levels, its historical overrepresentation of blacks at the staff-attorney level, its nonpromotion policy, and the exclusively white staff attorneys who have been promoted all have fostered a belief among Defendant's black staff attorneys that it is futile to seek promotion from staff attorney.

27.     The number of black staff attorneys employed by Defendant increased dramatically when it started the staff-attorney program. The overrepresentation of black attorneys as staff attorneys when compared to whites is striking:

## Distribution of Defendant's Practicing Attorneys

| YEAR | RACE | # OF ATTORNEYS | % PARTNERS | % OF COUNSEL | % ASSOCS. | % SENIOR ATTYS. | % STAFF ATTYS. |
|------|------|------|------|------|------|------|------|
| 2005 | White | 326 | 35 | 18 | 45 | 4 | 3 |
|      | Black | 13 | 46 | 0 | 39 | 0 | 15 |
|      |      |    |    |    |    |    |    |
| 2006 | White | 364 | 32 | 17 | 43 | 3 | 7 |
|      | Black | 26 | 23 | 4 | 31 | 4 | 42 |
|      |      |    |    |    |    |    |    |
| 2007 | White | 371 | 31 | 19 | 44 | 2 | 6 |
|      | Black | 37 | 16 | 3 | 27 | 3 | 54 |
|      |      |    |    |    |    |    |    |
| 2008 | White | 399 | 29 | 18 | 43 | 2 | 11 |
|      | Black | 49 | 10 | 2 | 29 | 2 | 59 |

28.     One in two black attorneys at Defendant is a staff attorney. It is one in fifteen for white attorneys. A black staff attorney is 7.5 times more likely to be assigned to the staff-attorney position than a white attorney. Thus, black attorneys are 7.5 times more likely than whites to be subject to Defendant's nonpromotion policy.

29.     Because the number of black staff attorneys is disproportionate to the number of white staff attorneys and given the comparatively lower total number of black lawyers nationally and locally _and_ given the comparatively lower total number of lawyers practicing with Defendant as partners, counsel, or associates, Defendant's nonpromotion policy disproportionately impacts blacks.

30.     Some of the black staff attorneys could have qualified for an associate position with Defendant.

31.     Thus, black lawyers have less opportunity to become partner, counsel, or associate at Defendant.

32.     Plaintiff is an African American.  She graduated from Howard University with a bachelor's degree in business administration (accounting) in 1991.  Plaintiff

graduated from the Georgetown Law Center in 1995. After graduation, she published her first book, ON OUR WAY TO BEAUTIFUL, to Random House.  She has lectured at universities, including Vassar College and Louisiana State University, provided commentary for National Public Radio, and wrote frequently for the Washington Post, USA Today, and other periodicals.  She also founded the legal website, www.onbeingablacklawyer.com.  For additional income, Plaintiff kept her resume on file with legal-placement agencies and often did contract legal work.

33.     In February 2005, Plaintiff was hired as a staff attorney by Defendant.

34.     In January 2006, Plaintiff was awarded a top bonus of $9,000.  During her annual review she was told that her work was excellent, that associates and partners enjoyed working with her, and that her diligence and efficiency made her extremely valuable.

35.     During her employment with Defendant, Plaintiff observed, experienced, or was subjected to the following harassment and disparate treatment:

a.     Pat Davies, the white male supervisor of Defendant's staff-attorney program, along with other white partners and associates, communicated via email and phone with white staff attorneys more often than they did with black staff attorneys.

b.     Mr. Davies and white partners and associates socialized with white staff attorneys inside and outside of the office more often than they did with black staff attorneys.

c.     White partners also took more of an interest in cultivating the careers of white staff attorneys. For example, George Pappas, a white partner, assisted a white staff attorney in raising his profile at Defendant by allowing him to bill hours to the partner's client development account.  The firm then allowed that staff

attorney to take summer associates to lunch and other activities.  Conversely, Mr.
Davies rebuffed Plaintiff's attempts to become more involved at the firm.

     d.     A white staff attorney downloaded a computer program unrelated to
her work to one of Defendant's computers. The program allowed the white staff
attorney to remotely monitor her dog by video streaming. On one occasion, the white
staff attorney showed the video stream of her dog to another white staff attorney,
who said, while motioning his head towards Plaintiff and another black staff
attorney, "He [the dog] looks like them."

     e.     Plaintiff saw an email string between two white staff attorneys that
was openly left for viewing on one of the white staff attorney's computer screens.
The email string contained derogatory language about black staff attorneys who
worked in the same room with Plaintiff and the white staff attorneys.

     f.     A black staff attorney complained about a fan blowing cold air in one
of the workrooms. A white staff attorney screamed at the black staff attorney,
relating her heritage to her temperature discomfort.

     g.     During a meeting, a white staff attorney informed members of a
workgroup to which Plaintiff belonged that one of Defendant's clients had called her
to inquire about her ethnicity. The white staff attorney stated—in a tone that
suggested the being black was undesirable—that she had assured Defendant's client
she was white.

     h.     A white staff attorney told a white associate that one of the black staff
attorneys "doesn't know any better." Plaintiff understood this statement to mean
that the black staff attorney lacked some cultural, social, or intellectual insight
because of her race or ethnicity.

i.      Plaintiff overheard a white staff attorney's telephone conversation with one of Defendant's apparently black mailroom employees. During the conversation, the white staff attorney mimicked the tone and speech pattern of the black employee. After hanging up, the white staff attorney continued mocking the black mailroom employee to the other white staff attorneys in the room.

j.      On numerous occasions, white staff attorneys, who self-identified as conservative Republicans, used racially charged language when discussing black people. They often referred to black people as "those people."

k.      On December 9, 2005, several white staff attorneys had a discussion in which they openly used racial slurs. Plaintiff and another black staff attorney heard the white staff attorneys use racial slurs for people of black ancestry or with dark skin. The white staff attorneys were reading aloud, and commenting on, various ethnic slurs compiled on en.wikipedia.org. At some point in the discussion, one of the white staff attorneys invited only the others to huddle around her computer in order to read certain ethnic slurs out of earshot of the two black staff attorneys in the workroom.

l.      On March 21, 2006—although it was not the first time it had occurred—Plaintiff discovered by overhearing the conversation of two white staff attorneys that a white associate had given certain, document-coding training to only the white staff attorneys in the workgroup to which Plaintiff belonged. Despite complaining to the white associate that she had not received the training information, the white staff attorneys continued to exclusively share a more expedient method of coding documents.

m.      On two occasions, Defendant awarded a higher bonus to a white staff

attorney whose performance on the same project was inferior to black staff

attorneys.

36.      In January 2006, Defendant awarded Plaintiff a bonus of $9,000.

37.      Mr. Davies told Plaintiff that her billable hours and evaluations were among

the best at the Firm.  He said that the only reason she did not receive a $10,000 bonus,

which was the maximum for staff attorneys, was because she had not been with the Firm

for one full year at the time of her evaluation.

38.      Plaintiff's 2007 evaluation included the following critique from Mr. Anthony

and Ms. Reid Reynolds: "[Plaintiff] has demonstrated a mastery of the facts and is

consistently accurate in her coding.  She is one of the fastest and most accurate reviewers

on the team.  Her diligence and efficiency have made her extremely valuable to the team…"

39.      In addition to Plaintiff receiving a higher bonus and a better evaluation than

most staff attorneys, she was also granted a raise each year.

40.      Plaintiff's base salary for most of 2005 was $70,000.  In January 2006, it rose

to $72,500, and in January 2007, it increased to $75,000.

41.      On March 23, 2006, Plaintiff sent Mr. Davies an email in which she reported

the problem of the white staff attorneys concealing document review information that

would have improved the JPMC team's production.

42.      Plaintiff also protested the use of derogatory language and racial slurs in the

office.

43.      Though Plaintiff was discreet and diplomatic in how she reported the

harassment, her statements regarding the "creation of cliques," "people are showing their

true selves;" "on occasion [chatter] veered into inappropriate terrain;" and "as a person of

color, I found this particularly offensive," made it clear that Plaintiff believed the white staff attorneys were harassing Plaintiff and participating in other discriminatory behavior.

44.   Because of the pervasiveness of the racial hostility at Defendant, plaintiff felt it was an issue that Mr. Davies should address with the entire staff attorney group; and therefore, wrote in her email subject line, "Issues that need to be addressed at tomorrow's luncheon."

45.   Later that day, Plaintiff met with Mr. Davies. She first expressed her intention to work at Defendant for the foreseeable future.  She also reminded Mr. Davies of the outstanding evaluation and high bonus she had received weeks earlier and expressed her desire to be promoted.  This was not the first time Plaintiff had expressed such a desire.

46.   In fact, staff attorney promotion was an issue that came up frequently in staff attorney staff meetings.

47.   Plaintiff then expressed her belief that the discriminatory way in which the staff attorneys were treated contributed to the racial tension, as did one white associate's favoring the white staff attorneys.

48.   Mr. Davies only addressed the issue of the racial slur.

49.   Following Plaintiff's meeting with Mr. Davies, one of the instigators of the racial-slur incident was relocated to another office on the same floor.  In addition, Plaintiff continued to work with the two primary instigators on a project.

50.   Defendant's Policies and Procedures Manual - Sexual and Racial Harassment Section states:  "Confidentiality will be maintained to the extent practical and appropriate under the circumstances."

51.   Mr. Davies disclosed Plaintiff's identity to one of the white staff attorneys who had used the racial slurs.

52.   Mr. Davies' disclosure was neither "practical" nor "appropriate."

12

53.   Mr. Davies' disclosure prompted the very thing the confidentiality policy is in place to prevent—further harassment of employees who report misconduct.

54.   Indeed, Sarah Wittig, one of the staff attorneys who used racial slurs, and the other white staff attorneys in the office began exhibiting even more hostile behavior towards Plaintiff and the other black staff attorney in the office.

55.   Immediately upon returning from the meeting with Mr. Davies, Ms. Wittig emailed and disclosed Plaintiff's identity to other staff attorneys.

56.   Thereafter, all but one white staff attorney in Plaintiff's office stopped speaking to Plaintiff and another black staff attorney. There were also staff attorneys in other offices that stopped speaking to Plaintiff.

57.   On March 24, 2006, the staff attorney group met for a scheduled luncheon.

58.   During the luncheon Mr. Davies sat at a table with staff attorneys who later told Plaintiff that Mr. Davies was very "jokey" at the table and made a point of playing down the racial slur incident and even went so far as to say that Plaintiff had misunderstood and overreacted.

59.   Towards the end of the luncheon, Mr. Davies addressed the racial slur incident as an afterthought.  To the entire group, Mr. Davies again implied that Plaintiff had misunderstood and overreacted to the racial slur incident.

60.   Mr. Davies never elaborated on how anyone could have misunderstood Ms. Wittig's improper use of an office computer and her use of derogatory words in the workplace.

61.   Mr. Davies closed with a derogatory analogy about his pet monkey.

62.   Defendant provided the following recollection of Mr. Davies' racially insulting remarks:

Davies' comment involved a monkey that he and his siblings kept as a pet when he was a child, and the fact that when the monkey escaped from the house, as it periodically did, his mother always wanted to know which sibling was responsible for letting the monkey escape, regardless of the excuse that the child might offer.

63.     Indeed, in this analogy, Mr. Davies is the mother, staff attorneys making racial comments are the siblings and the racial slurs and those offended by them (in this case, Plaintiff) are the monkey.

64.     Using a monkey in any way to reference black people is understood by everyone to be racist.  A recent article in the New York Daily News explains why this is:

Ongoing studies by a prominent psychologist at Stanford University suggest that the racist association of African-Americans with apes is so ingrained in our history and culture that it persists subconsciously even in college kids born after the civil rights movement.

The study's results were summarized in the 2008 paper "Not Yet Human: Implicit Knowledge, Historical Dehumanization and Contemporary Consequences."

"It was surprising to us how strong it was," the co-author, Stanford Associate Prof. Jennifer Eberhardt, said Wednesday of the persistent link. "It did give me cause for pause."[2]

65.     On March 27, 2006, Plaintiff emailed Mr. Davies and informed him that one of the individuals that had used racial slurs had disclosed Plaintiff's identity to other staff attorneys, all but one white staff attorney in the office were refusing to speak to Plaintiff, the behavior of the white staff attorneys was negatively impacting Plaintiff's work, and Plaintiff found the behavior of her white staff attorneys hostile.

66.     Plaintiff was also concerned because Vanessa Natale, one of the staff attorneys who had used racial slurs, had informed Plaintiff's supervisors about the transpiring incidents.

---

[2] The New York Daily News, "New York Post has gotta apologize over offensive chimpanzee cartoon," Thursday, February 19, 2009.

67.     Since Ms. Reid Reynolds socialized outside the office with the white staff attorneys, especially, Ms. Natale who she communicated with often during work hours, Plaintiff worried that this might threaten her employment.  This was evidenced by the problems that arose when Ms. Reid Reynolds did not communicate all pertinent JPMC case information to all staff attorneys.

68.     Because Plaintiff felt that the work environment had turned hostile, Plaintiff requested her own office.

69.     Defendant has a satellite location in which many staff attorneys are located.

70.     Some staff attorneys at the satellite office have their own offices; therefore, Mr. Davies could have accommodated Plaintiff's reasonable request.

71.     Rather than investigate the matter or implement prompt and appropriate corrective action, Mr. Davies sent Plaintiff an email that read in part: "I do not believe that the conduct that you described in your email would amount to a hostile environment."

72.     From this point forward, Mr. Davies ceased nearly all civil communication with Plaintiff; he did, however, continued to communicate via phone, email and privately in his office, with Ms. Natale, one of the parties that Plaintiff had identified as contributing to the hostile work environment.

73.     Two months earlier Mr. Davies had given Plaintiff high marks and awarded her a high bonus.  At no point before Plaintiff's report of discrimination and a hostile work environment had Mr. Davies admonished Plaintiff or treated her curtly; however, following Plaintiff's complaint, Mr. Davies was constantly humiliating Plaintiff.

74.     Mr. Davies subjected Plaintiff to increased and unwarranted scrutiny following the incidents in the spring of 2006.  He avoided speaking to or even making eye contact with Plaintiff at firm events, in the halls and in the cafeteria.

15

75.     On March 30, 2006, three days after Plaintiff complained about her increasingly hostile work environment, Mr. Davies moved Plaintiff and one of the white staff attorneys not speaking to Plaintiff to an office adjacent to Ms. Wittig's new office.

76.     Plaintiff and other staff attorneys saw Plaintiff's relocation as punishment for her having complained.

77.     On several occasions in 2006 and 2007, Mr. Davies ignored Plaintiff's emails and voice mail messages. Yet, he continued to welcome and invite to his office those white staff attorneys, who continued to harass Plaintiff.

78.     On October 17, 2006, Mr. Davies emailed Plaintiff, and stated that Ms. Reid Reynolds claimed that Plaintiff had worked from home for more than five hours a day (during the weekend), in violation of policy on the JPMC case. This was not true.

79.     Plaintiff sent an email explaining to Mr. Davies that she had worked in the office on the days in question.  Mr. Davies did not respond to Plaintiff's email.

80.     Plaintiff had, in fact, attached meal receipts to the timesheets she submitted to Ms. Reid Reynolds, which clearly showed that she was in the office during the days in question.

81.     Normally, Ms. Reid Reynolds would discuss a timesheet discrepancy with the staff attorney involved.  At this point, Ms. Reid Reynolds had been supervising Plaintiff for a year.  During that time, Plaintiff had always been receptive to Ms. Reid Reynolds feedback.  On an evaluation, Ms. Reid Reynolds had even said that Plaintiff "kept a good attitude." Yet, Ms. Reid Reynolds did not address the supposed "work from home" discrepancy with Plaintiff before reporting her to Mr. Davies.

82.     To further intimidate Plaintiff, Mr. Davies stated in his email that he had checked Plaintiff's timesheet against her entry keycard and discovered that on two occasions Plaintiff had come in a half hour after the time Plaintiff had recorded on her

timesheet. It was not common practice for Mr. Davies to compare a staff attorneys' timesheet and keycard entries.

83.     Any number of things could account for such a discrepancy. If one is entering the building with another person, then only one keycard will record the entry.  If the person who did not use the keycard leaves the building for a cup of coffee then uses the keycard to reenter the building, then that entry will appear to be the first for the day.

84.     Moreover, Defendant administrators who were responsible for signing off on the staff attorney timesheets had suggested that Plaintiff, and other staff attorneys, record their start times as 8:30 a.m. and then "make up" the time during lunch if, in fact, they had started after 8:30 a.m.  They said this made reconciliation easier for the accounting department.

85.     In the Fall of 2006 Defendant began a mandatory pro bono program for staff attorneys.  Before then, staff attorneys had not been provided Lexis passwords or training.

86.     On October 20, 2006, Plaintiff requested a Lexis password then spent about 15 minutes going over basic functions with the librarian.  Plaintiff inquired in an email to Mr. Davies to what account she should bill the fifteen minutes.

87.     Mr. Davis responded with an email that read in part:

It shouldn't have taken longer than a minute to compose an email to the library asking for a Lexis password.  Indeed, I'll now take care of getting every other staff attorney a Lexis password right now so the staff attorneys themselves don't go through the trouble of composing an email or walking to the library (and then bill the firm for it).  As for the additional training on Lexis that you elected, you should have sought authorization from me first if you expected the firm to pay you for the time.

88.     Plaintiff could only read Mr. Davies email to mean that she was to consider her Lexis training as work done off the clock.

89.     Mr. Anthony and Ms. Reid Reynolds provided evaluations of Plaintiff's performance on a single project in 2006 and 2007.

17

90.     Note their evaluation statements from each years:

*2006*: "[Plaintiff] has demonstrated a mastery of the facts and is consistently accurate in her coding.  She is one of the fastest and most accurate reviewers on the team.  Her diligence and efficiency have made her extremely valuable to the team…"

*2007*: "[Plaintiff] was considered a hard worker.  She applied herself well to the task of coding documents for responsiveness, confidentiality, and privilege.  She is responsive to instructions and queries concerning her work and has generally kept a positive attitude.  [Plaintiff's] normal review pace is significantly lower then [sic] the average pace and although her coding is generally accurate, her error rate is the [sic] among the highest for the team…"

91.     At no point during Plaintiff's time on the project did Mr. Anthony, Ms. Reid Reynolds, or anyone else ever advise Plaintiff that her error rate had gone up or that she had gone from being one of the fastest coders on the team to having a below average speed.

92.     In February 2007, the Firm provided Plaintiff with a $5,000 bonus.

93.     This was barely more than half the $9,000 she had received the previous, partial year and well below the $15,000 maximum given that year.

94.     There was no apparent, lawful explanation for Plaintiff receiving a lower bonus. Plaintiff maintained high billable hours and while not as favorable as her 2006 evaluation, Plaintiff's 2007 evaluation did not justify such a low bonus.

95.     Upon information and belief, Plaintiff believes she received the lowest bonus on the that project.  Plaintiff's bonus was even lower than that of Ms. Wittig who had repeatedly violated Defendant policies.

96.     Forty of the fifty-four staff attorneys evaluated received higher bonuses than Plaintiff whose bonus was in the bottom tier. Other staff attorneys who had not complained of discrimination had received a bonus equal to or less than Plaintiff's had low seniority, low billable hours or both.

97.     In March 2007, Ms. Natale informed Mr. Davies that she was accepting a position with the DC government.

98.     Mr. Davies then provided Ms. Natale with a "special project" that provided her with a substantial amount of overtime despite the fact that some African American staff attorneys were without work.

99.     Ms. Natale said that Mr. Davies wanted her to build a financial cushion before starting a lower paying job in the DC government.

100.    In the past, Defendant had included billable hours in its matrix for determining bonuses, so giving work to a white staff attorney who was leaving the Firm undermined black staff attorneys who were committed to Defendant.

101.    Additionally, Mr. Davies' treatment of Ms. Natale upon receiving her resignation differs greatly from the way he treated minorities when they proffered their resignations.

102.    When a black staff attorney gave her two weeks' notice, Mr. Davies pressured her into leaving the firm immediately.

103.    When another black staff attorney resigned, Mr. Davies screamed at her in a threatening manner.

104.    Mr. Davies continued ignoring Plaintiff's emails and avoiding her during 2007.  He also continued his scrutiny and harassment.

105.    On July 5, 2007 Mr. Davies admonished Plaintiff for sending a staff attorney group email asking if anyone was interested in purchasing her two tickets to a sporting event.

106.    Mr. Davies and other attorneys were routinely sending out group emails that contained jokes, ticket solicitations and information about trivial matters, so the only reason for Mr. Davies email was to harass Plaintiff.

19

107.    On July 13, 2007, Mr. Davies came to Plaintiff's office while Plaintiff was on leave that she had scheduled with the staff attorney manager, Ms. Maloney and entered into the billing system.

108.    Mr. Davies remarked loudly to six of Plaintiff's colleagues that Plaintiff was away from her desk while she was billing the Firm.

109.    Two staff attorneys were so alarmed by Mr. Davies' behavior that they immediately called Plaintiff.

110.    Plaintiff then called Mr. Davies and left a voicemail message for him confirming that she was on leave and stating that she wanted to speak with him about the incident.

111.    Mr. Davies never returned Plaintiff's call and avoided talking to her about the incident.

112.    On August 14, 2007, Defendant informed Plaintiff that it was terminating her. When Plaintiff asked why, she was provided no explanation.

113.    Defendant's disparate treatment of, harassment of, and retaliation against Plaintiff were serious and significant.  Plaintiff suffered severe stress, which caused her to suffer a medical condition.

**V.      CLAIMS**

### COUNT I
### (Discriminatory Job Assignment and Promotion)

114.    Plaintiff incorporates, as though restated here, each of the factual allegations stated in paragraphs 1 through 113.

115.    Plaintiff is black and falls within a class of persons protected by Title VII, § 1981, and the DCHRA.

116.    Defendant is an employer or person within the meaning of Title VII, § 1981, and the DCHRA.

117.    The policies and practices Defendant uses for assigning attorneys to positions within the firm discriminate against black attorneys and result in the majority of them being assigned to the position of staff attorney.

118.    The policies and practices Defendant had been using for promoting staff attorneys discriminate against black staff attorneys and have resulted in no black staff attorneys ever being promoted by Defendant.

119.    Defendant, however, has promoted to associate and counsel positions white staff attorneys who were less qualified than Plaintiff and others similarly situated to her have been promoted.

120.    Defendant's disparate treatment in job-assignment and nonpromotion of Plaintiff and others similarly situated to her violates Title VII, § 1981, and the DCHRA.

121.    Defendant and its managers acted knowingly, willfully, and maliciously.

122.    Defendant had no legitimate business reason to discriminate against Plaintiff and others similarly situated to her in their job assignment and nonpromotion.

123.    Defendant's actions directly and proximately caused Plaintiff physical, psychic, reputational, and monetary injury.

### COUNT II
### (Adverse Impact and Effect of Job-Assignment
### Policy and No-Promotion Policies)

124.    Plaintiff incorporates, as though restated here, each of the factual allegations stated in paragraphs 1 through 123.

125.    Defendant's policies and practices and the criteria it uses in assigning attorneys to positions within the firm have an adverse impact on black attorneys in violation of Title VII and have the effect of violating the provisions of the DCHRA.

126.    Similarly, Defendant's policy and practice banning the promotion of staff attorneys has an adverse impact on black attorneys in violation of Title VII and has the effect of violating the provisions of the DCHRA.

127.    Defendant can accomplish the goals of its job-assignment and no-promotion policies by using other policies or practices that do not have, or have less of, an adverse impact or effect on black attorneys.

128.    It would have been futile for Plaintiff and others similarly situated to her to apply for an associate position with Defendant because of their awareness and Defendant's enforcement of the job-assignment and no-promotion policies.

129.    Defendant's employment policies and practices directly and proximately caused Plaintiff physical, psychic, reputational, and monetary injury.

## COUNT III
### (Discriminatory Treatment and Harassment)

130.    Plaintiff incorporates, as though restated here, each of the factual allegations in paragraphs 1 through 129.

131.    Defendant's managers and employees harassed Plaintiff on the basis of her race and treated her differently than her white coworkers in violation of Title VII, § 1981, and the DCHRA.

132.    Plaintiff neither invited nor consented to the harassment. Rather, she was offended by it and complained to Defendant about it.

133.    The harassment was severe and pervasive.

134.    Defendant had no legitimate business reason for treating Plaintiff differently from her white coworkers.

135.    Defendant and its managers knowingly, willfully, and maliciously treated her differently on account of her race and failed to prevent the harassment she experienced.

22

136.    Defendant's acts and omissions directly and proximately caused Plaintiff's physical, psychic, reputational, and monetary injury.

## COUNT IV
### (Retaliation)

137.    Plaintiff incorporates, as though restated here, each of the factual allegations stated in paragraphs 1 through 136.

138.    Plaintiff engaged in protected activity under Title VII and the DCHRA by opposing Defendant's discrimination against her and others similarly situated to her.

139.    Plaintiff expressed protected speech under § 1981 and the First Amendment to the U.S. Constitution by publicly opposing Defendant's discrimination against her and others similarly situated to her.

140.    Defendant and its managers took materially adverse actions against Plaintiff in retaliation for her opposition, including, without limitation to, denying her a bonus, terminating her employment, and refusing to rehire her.

141.    Defendant and its managers acted knowingly, willfully, and maliciously.

142.    The actions of Defendant and its managers impaired Plaintiff's right to make and enforce contracts and to enjoy the full and equal benefits of all laws and proceedings enjoyed by white citizens.

143.    Defendant's misconduct directly and proximately caused Plaintiff physical, psychic, reputational, and monetary injury.

## COUNT V
### (Wrongful Termination)

144.    Plaintiff incorporates, as though restated here, each of the factual allegations stated in paragraphs 1 through 143.

23

145.    Defendant terminated Plaintiff on the basis of her race and/or because she opposed the discrimination to which it subjected her in violation of Title VII, § 1981, and the DCHRA.

146.    Defendant had no legitimate business reason to terminate Plaintiff.

147.    Defendant terminated Plaintiff knowingly, willfully, and intentionally in violation of antidiscrimination law.

148.    Defendant's misconduct directly and proximately caused Plaintiff physical, psychic, reputational, and monetary injury.

## COUNT VI
### (Discriminatory Subterfuge)

149.    Plaintiff incorporates, as though restated here, each of the factual allegations stated in paragraphs 1 through 148.

150.    Defendant, in violation of the DCHRA, took the discriminatory and retaliatory actions against Plaintiff for reasons that would not have been asserted but for, wholly or partially, a discriminatory reason based on Plaintiff's race.

151.    Defendant's misconduct directly and proximately caused Plaintiff physical, psychic, reputational, and monetary injury.

## COUNT VII
### (Negligent Supervision)

152.    Plaintiff incorporates, as though restated here, each of the factual allegations stated in paragraphs 1 through 151.

153.    Defendant owed Plaintiff a duty to ensure its managers complied with and enforced federal and local antidiscrimination law.

154.    Pat Davies, among other things, failed to address Plaintiff's complaints of discrimination, failed to take appropriate steps to address the discriminatory conduct of the employee's he managed, and failed protect Plaintiff from retaliation by his subordinates.

24

155.   Defendant breached its duty to Plaintiff by negligently, recklessly, or indifferently supervising Pat Davies's management of the staff attorneys and their work environment.

156.   Defendant's supervision of or failure to supervise Mr. Davies directly and proximately caused Plaintiff physical, psychic, reputational, and monetary injury.

## VI.   <u>RELIEF REQUESTED</u>

157.   Based on the allegations made in this Complaint, Plaintiff requests the following relief:

A.     An order finding that Defendant violated federal and local antidiscrimination law by (1) implementing a policy that has an adverse impact on black attorneys, (2) wrongfully terminating and retaliating against Plaintiff, (3) using subterfuge to accomplish its discriminatory actions, and (4) permitting its employees to harass Plaintiff;

B.     An order enjoining Defendant from using its present attorney job-assignment process and from banning the promotion of staff attorneys;

C.     An order reinstating Plaintiff to her job with Defendant;

D.     An award of damages in an amount to be determined by a jury that includes back-pay, front-pay, other compensatory damages, statutory damages equal to the cap, pain and suffering damages, punitive damages, pre- and post-judgment interest, and attorney's fees and costs; and

E.     Any other relief the Court deems necessary and appropriate.

Submitted on behalf of Plaintiff by:

Latif Doman (DC 466654)

25

**DOMAN DAVIS LLP**
118 Adams Street, N.W.
Washington, DC 20001
Phone: (202) 271–2533
Fax: (888) 479-3330
latif.doman@domandavis.com

## DEMAND FOR A JURY TRIAL

Plaintiff demands that her claims be decided at trial by a jury.