**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                            )
YOLANDA YOUNG,                              )
                                            )
            Plaintiff,                      )
                                            )
      v.                                    )      Civil Action No. 09-464 (RBW)
                                            )
COVINGTON & BURLING, LLP,                   )
                                            )
            Defendant.                      )
_____)

## MEMORANDUM OPINION

      The plaintiff, Yolanda Young, brings this action against the defendant, the law firm of Covington & Burling, LLP ("Covington"), alleging that the defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-3(a), 16(a) (2006) ("Title VII") and the District of Columbia Human Rights Act ("Human Rights Act"), D.C. Code §§ 2-1401.01(a)(1), 2-1402.11(a)(1), and 2-1402.61(a) & (b) (2006), when it allegedly discriminated against her based on race during her employment at Covington and then retaliated against her based on her complaints about the alleged discrimination, which culminated in her termination.  First Amended Complaint ("Am. Compl.") ¶¶ 1-4.  This matter is currently before the Court on Covington's motion to dismiss Counts II and VII of the plaintiff's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant's Motion to Dismiss Counts II and VII Under Fed. R. Civ. P. 12(b)(6) ("Def.'s Mot."), which alleges that Covington's job-assignment and non-promotion policies adversely impact blacks, including the plaintiff, a black female, and that Covington did not take appropriate steps to address the racial discrimination that permeated

the firm.  The plaintiff opposes Covington's motion.[1]  Plaintiff's Opposition to Defendant's Second Motion to Dismiss ("Pl.'s Opp'n").  For the following reasons, the Court must grant in part and deny in part Covington's motion.

## I.  BACKGROUND

The plaintiff, who is black, graduated from the Georgetown Law Center in 1995 and worked as a staff attorney at Covington from February 2005 through August 2007.  Am. Compl. ¶¶ 7, 32, 34, 112.  According to the plaintiff, Covington created the position of staff attorney in 2005 for "licensed, experienced attorneys who . . . primarily perform online document review, but . . . [who also perform] in a variety of ways as practicing attorneys."  Id. ¶ 18.  She further contends that in 2006, Covington "implemented a policy[,] in [its] Washington [office,] banning the promotion of all staff attorneys."  Id. ¶ 21.  Additionally, she asserts, staff attorneys' salaries do not increase with seniority, while in comparison, attorneys hired to the positions of associate, counsel, and partner, enjoy significantly higher salaries that increases with seniority, and who also benefit from the prospect of promotion[2] from associate to counsel, and then, eventually, to partner.  Id. ¶ 19.

The plaintiff alleges that in the course of her employment at Covington, she observed her white male supervisor communicate, socialize, and take a more active interest in cultivating the careers of white staff attorneys.  Id. ¶¶ 35(a)-(c).  The plaintiff further alleges that she experienced an environment fraught with racial discrimination and hostility against her and other blacks.  Id. ¶¶ 35(d)-(m).  The plaintiff alerted her supervisor of her concerns, but claims that

---

[1]    The Court also considered the following documents in resolving this motion: Memorandum in Support of Defendant's Motion to Dismiss Counts II and VII Under Fed. R. Civ. P. 12(b)(6) ("Def.'s Mem.") and Reply Memorandum in Further Support of Defendant's Motion to Dismiss Counts II and VII Under Fed. R. Civ. P. 12(b)(6) ("Def.'s Reply").

[2]    The plaintiff represents that "[a] promotion meant a more diverse set of legal responsibilities and more money."  Am. Compl. ¶ 19.

Case 1:09-cv-00464-RBW   Document 46   Filed 01/28/10   Page 3 of 25

they were met with indifference.  Id. ¶¶ 35(l), 75.  The plaintiff further points to a discrepancy

between her 2006 and 2007 performance evaluations, the latter which was noticeably more

negative and critical.  Id. ¶ 90.  The plaintiff also received a reduced bonus in 2007, which

amounted to $5,000, "barely more than half the $9,000 she had received the previous, partial

year and well below the $15,000 maximum given that year."  Id. ¶ 93.  Given that she maintained

high billable hours and had previously been evaluated positively, the plaintiff asserts that there

"was no apparent, lawful explanation for [her] receiving a lower bonus."  Id. ¶¶ 90, 93, 94.  And

the plaintiff represents that several months after receiving her 2007 performance evaluation,

"[o]n August 14, 2007, [the d]efendant informed [the p]laintiff that it was terminating her"

without any explanation.  Id. ¶ 112.

   The plaintiff alleges that the data that she has compiled indicates that blacks are

disproportionately and overly represented as staff attorneys.  See generally id.  She further

alleges that "[t]he number of black staff attorneys employed by [Covington] increased

dramatically when it started the staff[]attorney program."  Id. ¶ 27.  Furthermore, according to

the plaintiff, "[o]ne in two black attorneys at [the Covington] is a staff attorney[, while only] . . .

one in fifteen white attorneys" have this status.  Id. ¶ 28.  Therefore, calculates the plaintiff, "[a]

black staff attorney is 7.5 times more likely to be assigned to the staff[]attorney position than a

white attorney."  Id.

   The plaintiff also proffers that her data indicates that at least "[s]ome of the black

attorneys could have qualified for an associate position with [Covington]."  Id. ¶ 30.  According

to the plaintiff, "[b]lack practicing attorneys, as a group, typically graduated from higher ranked

law schools than their white colleagues."  Id. ¶ 16.  The plaintiff further alleges that a

comparison of the credentials of black and white attorneys at Covington, based on a

"combination of law school grades, journal membership, and clerkship experience," indicates that Covington's "job-assignment criteria requires that black staff attorneys graduate from higher ranked schools than its white staff attorneys."  Id. ¶¶ 15, 17.  As a result, the plaintiff claims that "black lawyers have less opportunity to become partner, counsel, or associate at" Covington, with the benefits commensurate with those positions.  Id.  ¶ 31.  Essentially, the plaintiff argues that Covington's "non-promotion policy disproportionately impacts blacks."  Id. ¶ 29.

Based on these allegations, the plaintiff filed an administrative charge with the Equal Employment Opportunity Commission ("EEOC") and the District of Columbia Human Rights Commission on June 13, 2008.  Id. ¶ 9.  On December 16, 2008, the EEOC notified the plaintiff of her right to sue the defendant for the allegations advanced in her administrative charge of discrimination.  Id. ¶ 10.  The plaintiff then filed her complaint in this action asserting claims of (1) "[d]iscriminatory [j]ob assignment and [p]romotion" (Count I), (2) "[a]dverse [i]mpact and [e]ffect of [j]ob [a]ssignment [p]olicy and [n]o-[p]romotion [p]olicies" (Count II), (3) "[d]iscriminatory [t]reatment and [h]arassment" (Count III), (4) "[r]etaliation" (Count IV), (5) "[w]rongful [t]ermination" (Count V), (6) "[d]iscriminatory [s]ubterfuge" (Count VI), and (7) "[n]egligent [s]upervision" (Count VII).  See generally id.

## II.  STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether the plaintiff has properly stated a claim upon which relief may be granted.  Woodruff v. DiMario, 197 F.R.D. 191, 193 (D.D.C. 2000).  For a complaint to survive a Rule 12(b)(6) motion, it need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the claim is and the grounds on which it rests," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

(2007) (citation omitted).  "Although detailed factual allegations are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the grounds of entitlement to relief, a plaintiff must furnish more than labels and conclusions or a formulaic recitation of the elements of a cause of action."  Hinson ex rel N.H. v. Merritt Educ. Ctr., 521 F. Supp. 2d 22, 27 (D.D.C. 2007) (internal quotation marks omitted) (quoting Twombly, 550 U.S. at 555).  Or, as the Supreme Court more recently stated, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (quoting Twombly, 550 U.S. at 556).  A complaint alleging facts which are "'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  Id. (quoting Twombly, 550 U.S. at 557) (brackets omitted).  Moreover, "[a] dismissal with prejudice is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."  Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (internal quotation marks and citations omitted) (emphasis in original).  Finally, in evaluating a Rule 12(b)(6) motion, "[t]he complaint must be liberally construed in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979) (internal quotation marks and citations omitted), and the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice[,]" E.E.O.C. v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997) (footnote omitted).

## III.  LEGAL ANALYSIS

**A.    Count II (Adverse Impact and Effect of Job-Assignment Policy and Non-Promotion Policies)**

Count II of the plaintiff's complaint alleges that (1) Covington's "policies[,] practices[,] and . . . criteria it uses in assigning attorneys to positions within the firm have an adverse impact on black attorneys in violation of Title VII and have the effect of violating the provisions of the [Human Rights Act]," Am. Compl. ¶ 125; (2) Covington's "policy and practice of banning the promotion of staff attorneys has an adverse impact on black attorneys in violation of Title VII and has the effect of violating the provisions of the [Human Rights Act]," id. ¶ 126; (3) Covington "can accomplish the goals of its job-assignment and no[n]-promotion policies by using policies or practices that do not have, or have less of, an adverse impact or effect on black attorneys," id. ¶ 127; (4) "it would have been futile for [the p]laintiff and others similarly situated to her to apply for an associate position with [the d]efendant because of their awareness and [the d]efendant's enforcement of the job-assignment and no[n]-promotion policies," id. ¶ 128; and (4) Covington's "employment policies and practices directly and proximately caused [the p]laintiff physical, psychic [sic], reputational, and monetary injury," id. ¶ 129.

Covington argues that the Court should dismiss the plaintiff's disparate-impact claims because (1) the plaintiff failed to make such a charge in her administrative complaint "filed with the EEOC and thus failed to exhaust her administrative remedies as required by law[;]" (2) the plaintiff's "complaint makes clear that she cannot prove that she would have been 'assigned' or promoted to the position of partner, counsel, or associate at Covington but for any facially-neutral policies that she now seeks to challenge[;]" and (3) "insofar as [the plaintiff] makes a disparate[-]impact claim with respect to her 'assignment' to a staff attorney position at the time of her hire, her claim is time-barred."  See Def.'s Mem. at 4.

1.        **The Defendant's Exhaustion of Administrative Remedies Challenge**

Covington argues that the plaintiff's administrative charge filed with the EEOC did not

allege any disparate-impact claim arising from a facially non-discriminatory policy.  Def.'s Mem.

at 5-6.  Specifically, Covington contends that the plaintiff's administrative charge did "not make

any specific factual allegations relating to her promotion claim or her hiring/assignment claim,"

nor did it "challenge any facially non-discriminatory policy regarding the assignment or

promotion of attorneys."  Id. at 6.  Thus, it is Covington's position that "the disparate[-]impact

allegations now included in Count II [of the amended complaint filed in this Court] were neither

referenced in the EEOC charge nor reasonably related to the allegations in [that] charge."  Id.  In

response, the plaintiff argues that her administrative complaint "plainly alleges that the

disproportionate racial makeup of the staff attorneys resulted in black staff attorneys not being

promoted."  Pl.'s Opp'n at 6.  And underlying this charge, she contends, are the premises that

blacks are disproportionately assigned to staff attorney positions and that Covington "will not

consider staff attorneys for promotion, which results in a disproportionate number of blacks

[being] ineligible for promotion."  Id.

"A Title VII lawsuit following the EEOC charge is limited in scope to claims that are

'like or reasonably related to the allegations of the charge and growing out of such allegations.'"

Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995) (quoting Cheek v. W. & S. Life Ins.

Co., 31 F.3d 497, 500 (7th Cir. 1994)).  "Title VII claims must arise from 'the administrative

investigation that can reasonably be expected to follow the charge of discrimination.'"  Id.

(quoting Chisholm v. U.S. Postal Serv., 665 F.2d 482, 491 (4th Cir. 1981)).  However, the

purpose of an administrative charge is to "giv[e] the charged party notice of the claim and

narrow[] the issues for prompt adjudication and decision."  Id. (internal quotations omitted).

Accordingly, "[a] court cannot allow liberal interpretation of an administrative charge to permit a litigant to bypass the Title VII administrative process." Id.

In Park v. Howard University, a case relied upon by Covington, Def.'s Mem. at 7, the Court eventually dismissed a plaintiff's hostile work environment claim because it found that the plaintiff's previously filed EEOC "charge [had] contained no claims or factual allegations that could reasonably be expected upon investigation to lead to a hostile work environment claim." 71 F.3d 904, 909 (D.C. Cir. 1995); see also Marshall v. Fed. Express Corp., 130 F.3d 1095, 1098 (D.C. Cir. 1997) (finding that "[t]he commission could not reasonably be expected to investigate [the plaintiff's] firing based on the allegations in the charge" when "the charge filed by [the plaintiff] with the EEOC made no mention of her termination").  The Court arrived at this conclusion based on

> Title VII['s] require[ment] that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge. Only after the EEOC has notified the aggrieved person of its decision to dismiss or its inability to bring a civil action within the requisite time period can that person bring a civil action herself.

Id. at 907 (citing 42 U.S.C. § 2000e-5(f)(1)).

In this case, the only allegation in plaintiff's EEOC charge relating to assignments or promotions states, in relevant part:

> Staff attorneys are comprised of a population of approximately 30% Blacks and 30% other minorities.  Due to this race composition, Staff Attorneys are subjected to the following conditions that other positions, comprised of low minority populations, are not: segregated, unfavorable work spaces, denial of maternity and jury leave, lack of promotional consideration and exclusion from retreats and office events.  Since my employment began, I was subjected to these disparate conditions.

Def.'s Mem., Ex. 1 at 3 (June 5, 2008 Charge of Discrimination).  Because the plaintiff's administrative charge does not directly assert any complaint against Covington's non-promotion policy or the method of "assigning attorneys to positions within the firm," Am. Compl. ¶ 125, it might at first blush appear that the plaintiff failed to exhaust her administrative remedies with respect to her disparate treatment claim because she did not identify and expressly challenge the non-promotion or assignment policies in her administrative charge.  However, countervailing standards must also guide the Court's consideration, and in this case, command a different result.

When considering a motion to dismiss, "[t]he nonmoving party is entitled to all reasonable inferences that can be drawn in her favor."  Artis v. Greenspan, 158 F.3d 1301, 1306 (D.C. Cir. 1998) (emphasis in original).  Here, the plaintiff prefaced her administrative charge stating that the conditions to which she was allegedly subjected were "due to [the] race composition" of Covington's staff attorneys.  Def.'s Mem., Ex. 1 at 2 (June 5, 2008 Charge of Discrimination).  The Court can easily infer from this language that the plaintiff's administrative charge was challenging Covington's policies, which she contends resulted in disproportionate representation of minorities in staff attorney positions, as she also alleges that attorneys in these positions "lack of promotional consideration."  Id.  Although not articulated with precision, this administrative complaint was clearly sufficient to put both the EEOC and Covington on notice that a disparate-impact charge was being asserted.  Def.'s Mem., Ex. 1 at 3 (June 5, 2008 Charge of Discrimination).  While the plaintiff is not correct that her "[disparate]-impact claim appears plainly on the face of [her] charge of discrimination," Pl.'s Opp'n at 7, her assertion regarding the disproportionate racial composition of blacks in staff attorney positions adequately raised the inference that Covington's policies were driving the racial demographic of attorneys in those positions, which resulted in the plaintiff being denied certain benefits and promotional

opportunities.  The Court must then reasonably infer that the plaintiff was attacking Covington's non-promotion policies in her administrative charge.  Accordingly, because the plaintiff's challenge to Covington's job assignment and non-promotion policies in this Court are "reasonably related to the allegations of the [administrative] charge," Park, 71 F.3d at 907 (citation omitted), the Court must conclude that the plaintiff adequately exhausted her administrative remedies and therefore Count II cannot be dismissed on this basis.

      2.      **The Defendant's Standing Challenge**

Covington further argues that Count II should be dismissed because "[the plaintiff] lacks standing to assert claims regarding Covington's purported assignment and promotions policies." Def.'s Reply at 6.  Covington argues that the plaintiff failed to allege that "she was personally harmed by either policy," id., and also that she would have actually been qualified for a higher position, id. at 9.  In response, the plaintiff argues that she was presumptively unqualified by Covington because its non-promotion "policy . . . disqualifie[d] her and all other staff attorneys without any business necessity," Pl.'s Opp'n at 9, while in reality she was "objectively qualified to perform the job of associate, of counsel, or partner in absence of the policy ban" considering her "graduation from a law school approved by the American Bar Association, passage of a bar exam . . . , receipt of a license to practice law . . . , and number of years of practice," id. at 9-10.

Anyone who has Article III standing has standing to bring an action under Title VII.  Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1278 (D.C. Cir. 1994).  Thus, because Title VII "specifically permit[s] any 'person claiming to be aggrieved' by an unlawful employment practice to file suit[,] . . .  [t]his language  . . . opens the courts to 'anyone who satisfies the constitutional requirements.'"  Id. (citations omitted).  "To demonstrate standing under Article III of the Constitution, [the plaintiff] must show an injury in fact caused

by the defendant and redressable by judicial relief." <u>Stilwell v. Office of Thrift Supervision</u>, 569 F.3d 514, 518 (D.C. Cir. 2009) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992)).  A qualifying injury must be "concrete and particularized" and either "actual or imminent." <u>City of Dania Beach, Fla. v. FAA</u>, 485 F.3d 1181, 1185 (D.C. Cir. 2007) (citing <u>Fla. Audubon Soc'y v. Bentsen</u>, 94 F.3d 658, 663 (D.C. Cir. 1996)).  In the context of a discrimination claim, this requirements means that that "plaintiff must show [that she has] suffered an adverse employment action." <u>Douglas</u>, 559 F.3d at 552.

> An adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits. An employee must experience materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.

<u>Id.</u> (citations and internal quotation marks omitted).  'There must [also] be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" <u>Lujan</u>, 504 U.S. at 560 (quoting <u>Simon v. E. Ky. Welfare Rights Org.</u>, 426 U.S. 26, 41-42 (1976)) (alterations in original).  Finally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" <u>Id.</u>

The plaintiff claims that Covington's job assignment and non-promotion policies "ha[d] an adverse impact on black attorneys," Am. Compl. ¶¶ 125-26, resulting in a disproportionate representation of blacks as staff attorneys, <u>id.</u> ¶ 117.  She further alleges that because she was subject to this racially disproportionate policy, she was hired as a staff attorney and therefore subsequently restricted by the non-promotion policy imposed on staff attorneys.  <u>Id.</u> ¶ 118.  As a result, the plaintiff contends that "[i]t would have been futile for [her] and others similarly

situated to her to apply for an associate position with [the d]efendant because of their awareness[,] and [the d]efendant's enforcement[,] of the job-assignment and no-promotion policies."  Id. ¶ 128.  And because Covington's policies had this effect, the plaintiff opines that she was deprived of opportunities for career advancement, "more money," and "a more diverse set of legal responsibilities."  Id. ¶ 19.

Based on these allegations, the Court finds that the plaintiff has alleged a "concrete" injury, which is attributable to Covington's hiring practices.  See Douglas v. Preston, 559 F.3d 549, 554 (D.C. Cir. 2009) (The "failure to be promoted categorically is an adverse employment action." (emphasis in original)); Phillips v. Cohen, 400 F.3d 388, 397 (6th Cir. 2005) (requiring "that the plaintiff demonstrate . . . that he or she was denied an employment opportunity because of a practice prohibited by statute" (citing Melendez v. Ill. Bell Tel. Co., 79 F.3d 661, 668 (7th Cir. 1996))); Melendez, 79 F.3d at 668 ("[W]here a plaintiff demonstrates that he was not . . . promoted as the direct result of a discriminatory hiring practice, he has suffered a personal injury within the meaning of Title VII."); see also Cerrato v. S.F. Cmty. College Dist., 26 F.3d 968, 976 (9th Cir. 1994) ("To establish standing, a person need only allege that a discriminatory policy exists that prevents him from competing on an 'equal basis.'").  As a result of these injuries, the plaintiff is seeking "[a]n order finding that [the d]efendant violated federal and local antidiscrimination law by . . . implementing a policy that has an adverse impact on black attorneys," in addition to "[a]n award of damages."  Am. Compl. ¶ 157.  While a finding that Covington's policies violated anti-discrimination laws will not make the plaintiff eligible for a promotion from a job that she has already lost, an award of damages would at least to some degree redress the injuries allegedly sustained by the plaintiff, and the plaintiff therefore has standing to maintain her Title VII disparate-impact claim.

### 3.      The Defendant's Statute of Limitations Challenge

Covington argues that the plaintiff "was required to file her charge [of disparate impact] within 300 days after the alleged unlawful employment practice occurred" under Title VII or "within one year under the [Human Rights Act]." Def.'s Mem. at 11.  Because Covington hired the plaintiff in 2005 and the non-promotion policy went into effect in 2006, Covington argues that the plaintiff's disparate-impact claim is now time-barred since she did not file her EEOC change until 2008. Id.  The plaintiff predicates her disparate-impact claim on both Covington's job-assignment and its non-promotion policies, Am. Compl. ¶¶ 124-28, and in response to its statutes of limitations challenges argues that she was evaluated "at least three times during her tenure[, which] . . . reinforced and capitulated the adverse job-assignment criteria and policy that Covington used for initial job assignments," Pl.'s Opp'n at 11.  The plaintiff therefore claims that because her last evaluation was within 300 days of her charge filing, her claim is not time-barred by either Title VII or the Human Rights Act.  Id.

It is apparent that Covington's position is that the operative date from which the start of the statute of limitations period for both Title VII and the Human Rights Act should commence is the date when the plaintiff was hired, Def.'s Mem. at 11, while the plaintiff maintains that each time Covington evaluated her performance, it "reinforced and recapitulated the adverse job-assignment criteria and policy that [it] used for initial job assignments," and therefore, effectively committed anew an adverse employment action, extending the life of the statutory limitations period,[3] Pl.'s Opp'n at 11.  Thus, it appears that the plaintiff concedes that if the controlling date

---

[3]      The plaintiff's 2007 bonus falls within both the statutes of limitations periods, as it was received in February 2007. Am. Compl. ¶ 92.  However, the date of the plaintiff's 2007 evaluation is not specified in her amended complaint.   The Court will therefore assume for the purposes of this decision, based on the information provided, that the plaintiff's position is correct that her "last evaluation, which resulted in her termination, occurred within 300 days of her charge filing date."  Pl.'s Opp'n at 11.

for statute of limitations purposes is when she was initially hired, her challenge to Covington's job assignment and non-promotion policies is barred by the statute of limitations periods of both Title VII and the Human Rights Act.  It is the plaintiff's position, however, that Covington's policies amounted to a continuing violation (i.e., later occurring acts that relate back to the date when she was hired), resulting in her disparate-impact claim not being barred by the applicable statutes of limitations.  See Palmer v. Kelly, 17 F.3d 1490, 1496 (D.C. Cir. 1994) ("[T]o recover for violations occurring outside limitations period, [the] plaintiff must prove either a 'series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the statutory period.'" (quoting Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395, 1422 (D.C. Cir. 1988))).

In assessing whether a continuing violation has been properly pled, the Court must analyze first, "whether an actual violation of Title VII [or the Human Rights Act] occurred during the statutory period" and second, "whether this discriminatory act either was part of a series of related discriminatory acts or was caused by a discriminatory system in effect both before and during the limitations period." Id. (applying this analysis to a Title VII claim); see also Lempres v. CBS Inc., 916 F. Supp. 15, 21 (D.D.C. 1996) (applying this analysis to a Human Rights Act claim).  The first prong of the continuing violation theory requires the occurrence of a discrete adverse act within the statute of limitations period.  See United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977) ("[T]he emphasis should not be placed on mere continuity; the critical question is whether any present violation exists.").  "Because 'significant' and 'objectively tangible' harm is required, performance evaluations ordinarily are not actionable under Title VII," id.; see Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001) ("The result of an evaluation is often speculative, making it difficult to remedy."); see also Taylor v. Small, 350

F.3d 1286, 1293 (D.C. Cir. 2003) ("Formal criticism or poor performance evaluations are not necessarily adverse actions and they should not be considered as such if they did not affect the employee's grade or salary." (quoting Brown v. Brody, 199 F.3d 446, 457-58 (D.C. Cir. 1999)) (internal quotation marks and brackets omitted)), nor the Human Rights Act, cf. Thong v. Andre Chreky Salon, 634 F. Supp. 2d 40, 44 n.2 (D.D.C. 2009) (observing that the standards applied to Title VII and the Human Rights Act "are the same, with D.C. courts consistently adopting Title VII decisions [when analyzing] the [Human Rights Act]").  However, the plaintiff's termination is certainly a significant and objectively tangible harm, and similarly, "the loss of a bonus can constitute an adverse employment action under Title VII [and the Human Rights Act]." Russell, 257 F.3d at 818.  And affording all reasonable inferences to the plaintiff at this stage in the case, as the Court is required, it must be presumed from the plaintiff's allegations that her negative evaluation in 2007, her reduced bonus, and her eventual termination were carried out with discriminatory intent.  Cf. Pryor v. NCAA, 288 F.3d 548, 565 (3d Cir. 2002) ("issues including state of mind (e.g., intent) are often unsuitable for a Rule 12(b)(6) motion to dismiss").  Accordingly, the Court finds that the plaintiff has alleged at least one occurrence of racial discrimination that fell within the statute of limitations period of both Title VII and the Human Rights Act.

The remaining question then is whether the discriminatory acts the plaintiff alleged were part of a larger "series of related discriminatory acts or was caused by a discriminatory system in effect both before and during the limitations period." Palmer, 17 F.3d at 1496.  It appears from how the plaintiff incorporated references to two polices in one disparate-impact claim that she hinges Count II on two distinct policies or theories of liability, i.e. that Covington's job-assignment policy and its non-promotion policy had an adverse impact on black attorneys hired

by the firm.  See Am. Compl. ¶¶ 124-129.  In Lorance v. AT&T Techs., Inc.,[4] the Supreme

Court noted that there is a distinction between a facially discriminatory system or policy, which

"by definition discriminates each time it is applied," from a facially neutral system or policy,

wherein "each application is nondiscriminatory."  490 U.S. 900, 912 n.5 (1989); see also Shea,

409 F.3d at 452 (finding that each paycheck was an unlawful application of a racially

discriminatory pay system); Anderson v. Zubieta, 180 F.3d 329, 337 (D.C. Cir. 1999) (finding

that each paycheck was an unlawful application of a policy that paid lower wages on the basis of

citizenship); Palmer, 17 F.3d at 1496 (finding that a supervisor's failure to inform the white

plaintiff of his promotion, so as to allow a black employee to assume the position upon the

plaintiff's retirement, was an unlawful application of a discriminatory policy to equalize the

number of blacks and whites promoted to higher level positions).  Accordingly, the Lorance

Court held that "when a seniority system is nondiscriminatory in form and application, it is the

allegedly discriminatory adoption which triggers the limitations period."  490 U.S. at 911

(emphasis in original).  The Lorance Court's holding teaches that a discriminatory policy

discriminates each time it is applied, and therefore, the continuing violation theory reinvigorates

the claim for statue of limitations purposes, each time the policy is applied; but by contrast, the

continuing violation theory is inapplicable to a facially neutral policy because "allowing a

facially neutral system to be challenged, and entitlements under it to be altered, many years after

its adoption would disrupt those valid reliance interests . . . ."  Id. at 912.  Here, the job-

---

[4]      Although the Lorance Court was specifically reviewing the "special treatment" of facially neutral seniority systems, 490 U.S. at 904, and its analysis has since been abrogated by 42 U.S.C. § 2000e-5(e)(2) with respect to the discriminatory application of seniority systems, "its reasoning remains persuasive outside of the Title VII/intentionally discriminatory seniority system context" because it "merely . . . appl[ies] . . . the traditional distinction between a continuing violation and the present consequences of a one-time past act of discrimination." Huels v. Exxon Coal USA, Inc., 121 F.3d 1047, 1050 n.1 (7th Cir. 1997) (quoting Knight v. City of Columbus, 19 F.3d 579, 585 n. 4 (11th Cir. 1994); Ross v. Buckeye Cellulose Corp., 980 F.2d 648, 659 n.18 (11th Cir. 1993) (internal quotations omitted)); see, e.g., Shea v. Rice, 409 F.3d 448, 452 (D.C. Cir. 2005) (observing that the analysis of Lorance still applies to a facially neutral system).

assignment and non-promotion policies do not constitute one overall system, as the plaintiff has framed Count II, see Am. Compl. ¶¶ 124-29; rather, they are discrete – and at least so far as the non-promotion policy is concerned, isolated – and therefore should have been assessed individually.  While the plaintiff alleges that the non-promotion and job-assignment policies involve the same type of racial discrimination, it is readily apparent that Covington's non-promotion policy did not result in a series of recurring events.  See, e.g., Albritton v. Kantor, 944 F. Supp. 966, 971 (D.D.C. 1996) (analyzing whether alleged discriminatory acts were part of a series by assessing if the alleged discrimination occurred more than once, if each occurrence was of the same type of discrimination, and if they lacked a degree of finality so as to "alert an employee of a need to assert his or her rights").  Indeed, the non-promotion policy was an isolated act, as compared to the job-assignment policy, because the non-promotion policy resulted in a final decision that Covington staff attorneys would have no prospect of career advancement at the time of its creation.  Accordingly, no reassessment of any staff attorney's position could breathe new life into the policy and the non-promotion policy is best viewed as a facially neutral policy that had its impact on the date of its adoption.  Lorance, 490 U.S. at 912. Therefore, whether the plaintiff can assert her challenges against Covington's job-assignment and non-promotion policies on the basis of a continuing violation theory depends upon the individual nature of the policies and whether each policy, in turn, relates to an adverse employment action that occurred within the applicable statute of limitations periods.

> **a.**     **The Plaintiff's Challenge of the Job-Assignment Policy Claim Is Not Barred by the Statutes of Limitations**

The exact nature of the job-assignment policy being challenged by the plaintiff is unclear, as she essentially presumes some race-based criteria was employed when she was hired.  For instance, the plaintiff challenges Covington's "policies . . .[,] practices[,] and . . . criteria it uses in

assigning attorneys to positions within the firm," and argues that, based "[o]n information and belief, [Covington] relies on job-assignment criteria that are not related to or predictive of job performance," including "a combination of law school grades, journal membership, and clerkship experience."  Am. Compl. ¶ 125.  The plaintiff bases her conclusion on statistics that she compiled, which allegedly indicate that lawyers hired as staff attorneys had credentials and graduated from law schools at least as good as or better than those lawyers hired as associates or partners.  Id. ¶¶ 16-17.  The plaintiff further maintains that "it appears that [Covington's] job-assignment criteria requires that black staff attorneys graduate from higher ranked schools than its white staff attorneys."  Id. ¶ 17.  Assuming that all of these allegations are true, as the Court must at this stage, it is reasonable to infer that Covington's job-assignment policy discriminates based on race.  Therefore, the issue then becomes whether, as the plaintiff argues, Covington's application of its performance evaluation criteria to her employment was an unlawful application of Covington's discriminatory job-assignment policy.

It is unclear at this juncture, not only what are Covington's initial job-assignment criteria, but whether its subsequent employee performance evaluations assess criteria which replicates that criteria used at the time of the initial job-assignment or is discriminatory in some other manner.  Nonetheless, it is the plaintiff's position that the initial assignment criteria are replicated because "[e]ach evaluation reinforced and recapitulated the adverse job-assignment criteria and policy that Covington used for initial job assignments."  Pl.'s Opp'n at 11.  In fact, it would seem only logical to conclude that the initial job-assignment criteria alleged by the plaintiff (i.e. law school grades, journal membership, and clerkship experience) is relevant only at the time of the job-assignment, when an employee's actual job performance and demonstrated skill are merely speculative, but lose their importance once actual job performance and demonstrated skill

become first known by an employer.  However, again at this stage in the case, the benefit of all

reasonable inferences must be construed in favor of the plaintiff and because it is at least

plausible, even if only minimally, that Covington utilized discriminatory criteria as part of its

annual performance evaluations of its attorneys, the plaintiff is entitled to benefit of that doubt.

Therefore, the Court cannot dismiss the plaintiff's disparate-impact claim as untimely because it

is based upon the theory that Covington's initial job-assignment policy was racially

discriminatory and that she was subjected to it each time her job performance was evaluated, the

last evaluation having occurred within the governing status of limitation periods.

> **b.    The Plaintiff's Challenge of the Non-Promotion Policy Is Barred by the Statutes of Limitations**

The plaintiff alleges that Covington's non-promotion policy categorically prohibits the

promotion of staff attorneys.  Am. Compl. ¶ 21.  Because that categorization does not have

facially discriminatory implications, it is facially race-neutral; however, it can still be subject to

an actionable discrimination claim if the policy has a "disparate impact on the basis of race."  42

U.S.C. § 2000e-2(k)(1)(A)(i).  But, even where a policy or practice has a disparate impact on a

protected class, "[a]n employer may defend against liability by demonstrating that the practice is

'job related for the position in question and consistent with business necessity.'"  Ricci v.

DeStefano, __ U.S. __, __, 129 S. Ct. 2658, 2673 (2009).  And unless the plaintiff can then

"show[] that the employer refuses to adopt an available alternative employment practice that has

less disparate impact and serves the employer's legitimate needs," the policy need not be

abandoned.  Id.  However, with respect to whether a claim based on the continuing violation

theory can be maintained, the alleged violation must be "caused by a discriminatory system in

effect both before and during the limitations period."  Palmer, 17 F.3d 1496 (emphasis added).

It appears that the non-promotion policy was implemented in 2006, after the plaintiff was hired, Am. Compl. ¶¶ 20-21, but she does not allege that she attempted to acquire a promotion or applied for one of the associate positions at Covington at any time during her employment. Because the statute of limitations would bar recovery for this alleged 2006 transgression – the adoption of the non-promotion policy – since the plaintiff did not file a complaint of discrimination until 2008, id. ¶ 9, the plaintiff relies upon the doctrine of futility and the continuing violation theory in her attempt to preserve the claim, id. ¶¶ 45 & 128 (indicating that the plaintiff "expressed her desire to be promoted," but "[i]t would have been futile for [her] . . . to apply for an associate position").  Regarding the doctrine of futility, it "is reserved for only 'the most invidious effects of employment discrimination,'" Youssef v. F.B.I., 541 F. Supp. 2d 121, 153 (D.D.C. 2008) (quoting Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 365-67 (1977)), and the lack of upward mobility from a staff attorney position to any other attorney position at Covington is a proscription that applied to all staff attorneys regardless of race.  This reality does not easily lend itself to the conclusion of continuing racial discrimination by Covington as the plaintiff alleges here.  Asserting futility in the absence of any effort to obtain another attorney position at Covington fails to support the existence of a continuing violation because individuals allegedly subject to the policy, such as the plaintiff, must be able to assert "that [t]he[y] would have applied but for discrimination and that [t]he[y] would have been discriminatorily rejected had [t]he[y] applied." Int'l Bhd. of Teamsters, 431 U.S. at 368 n.52 (emphasis added).  The plaintiff has not met the burden of alleging that she and all similarly situated black attorneys would have been rejected because of their race; all the Court can glean from her complaint is that they would have been denied a promotion because they held the positions of staff attorneys.  Accepting the plaintiff's allegations as true, as the Court must

presume at this stage, she has merely asserted that after the non-promotion policy was instituted in 2006 the number of black staff attorneys increased in 2007 and 2008, while the number of blacks in associate, of counsel, or partnership positions decreased in those years and the number of white attorneys in all three categories experienced little variation.  Am. Compl. ¶ 27.  The problem is that the plaintiff does not allege that any exceptions to the non-promotion policy were made for any staff attorney, regardless of race.  It would not be reasonable for the Court to infer futility under these circumstances, as the doctrine has no appropriate application.  Essentially, with respect to the non-promotion policy, the plaintiff is asking the Court to infer that because there was an increase in the number of black staff attorneys at Covington from 2005 until 2008, while the number of black attorneys did not increase in other attorney positions within the firm, that Covington had an ongoing policy that adversely impacted black attorneys.  Yet, there is no allegation that any staff attorney was transferred or promoted to a different attorney position or that the number of non-black attorneys in non-staff attorney positions increased; in fact, the number of white non-staff attorneys varies throughout 2006-08 by only one or two in every category except for the position of partner, which actually decreased by three attorneys.  Id.  The evidence proffered by the plaintiff therefore fails to support the inference that a continuing violation occurred for statute of limitations purposes.

With respect to the plaintiff's employment specifically, "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination."  Delaware State College v. Ricks, 449 U.S. 250, 257 (1980) ("It is simply insufficient for [the plaintiff] to allege that [the] termination 'gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination.'" (citation omitted)).  In other words, the fact that the plaintiff was employed by Covington during the

limitation periods is insufficient to save her disparate-impact claim based on her non-promotion continuing violation theory.  As with the seniority system in <u>Lorance</u>, the proper time within which the plaintiff should have submitted her administrative claim was therefore 300 days after the implementation of Covington's non-promotion policy to satisfy statute of limitation of Title VII and one year to satisfy the statute of limitation of the Human Rights Act.  <u>See</u> <u>Lorance</u>, 490 U.S. at 913 ("With a facially neutral system the discriminatory act occurs <u>only</u> at the time of adoption, for each application is nondiscriminatory.").  Nor are Covington's job-assignment and non-promotion policies sufficiently related to view them as all part of one overall continuing scheme designed to discriminate against its black attorneys.  <u>Palmer</u>, 17 F.3d at 1496.  Whether black and non-black attorneys are provided with different work assignments and positions is distinguishable from whether staff attorneys as a whole may be transferred or promoted to other attorney positions at Covington.  The fact that the staff attorney position is not a pathway to partnership is not a discriminatory policy that is reinvigorated each time a new staff attorney is hired or evaluated.  Indeed, the plaintiff continued to work under the non-promotion staff attorney policy, and she made no complaint within the requisite statutory timeframe after the policy was initiated.  While her ultimate administrative complaint can be construed as having raised a disparate-impact claim, to the extent that that claim is based on the non-promotion policy, the complaint was untimely.  Therefore, to the extent that the plaintiff's disparate-impact claim is premised on Covington's non-promotion policy, it is time-barred.

**B.      Count VII (Negligent Supervision)**

Despite the plaintiff's contention that the defendant was bound to abide by antidiscrimination laws in accordance with "an employer's common law duty to keep the workplace safe," and that the defendant's failure to keep confidential the plaintiff's allegations regarding violations of antidiscrimination laws "could [have] result[ed] in violence," Pl.'s Opp'n at 12, Covington correctly argues that under Griffin v. Acacia Life Ins. Co., 925 A.2d 564, 576 (D.C. 2007), "a common law claim of negligent supervision may be predicated only on common law causes of action or duties otherwise imposed by the common law."[5]   As no common law claim or duty has been alleged in this case, the plaintiff's negligent supervision claim must be dismissed.

In Griffin, the plaintiff predicated her negligent supervision claim on the failure of her supervisor to prevent sexual harassment.  The court affirmed the trial court's grant of summary judgment against the plaintiff, concluding that "the common law did not recognize an employer's duty to prevent the sort of sexual harassment alleged."  Griffin, 925 A.2d at 576.  "To hold otherwise," the court held, "'would be to impose liability on employers for failing to prevent a harm that is not a cognizable injury under the common law."  Id. at 577.  Accordingly the Griffin court, unless the act manifests itself "by other actionable wrongful conduct, e.g., assault and battery[,] . . . respect for the legislature . . . requires that the rights of a victim of non-physical

---

[5]      A cause of action for the common law tort of negligent supervision arises from the employer's breach of duty to the employee, classified as:

> 1.   The duty to provide a safe place to work.
> 2.   The duty to provide safe appliances, tools, and equipment for the work.
> 3.   The duty to give warning of dangers of which the employee might
>       reasonably be expected to remain in ignorance.
> 4.   The duty to provide a sufficient number of suitable fellow servants.
> 5.   The duty to promulgate and enforce rules for the conduct of employees
>       which would make the work safe.

Griffin, 925 A.2d at 576 (quoting Prosser & Keeton on Torts § 80, at 569 (5th ed.1984) (footnotes omitted)).

sexual harassment be limited by the remedies which the legislature has provided in the [Human Rights Act]," id., and by the same reasoning, this Court holds that the same is true under Title VII.  Thus, the Griffin court held that "a negligent supervision claim cannot be predicated on the [Human Rights Act]."  925 A.2d at 577.  And again, this Court concludes, the same reasoning equally applies in the Title VII context.

Here, the plaintiff predicates her negligent supervision claim precisely on the failure to abide by Title VII and the Human Rights Act.  See Am. Compl. ¶¶ 152-156.  Specifically, she claims that (1) Covington "owed [her] a duty to ensure [that] its managers complied with and enforced federal and local antidiscriminatory law" id. ¶ 153; (2) her supervisor "failed to address [her] complaints of discrimination, failed to take appropriate steps to address the discriminatory conduct of the employee's [sic] he managed, and failed to protect [the p]laintiff from retaliation by his subordinates," id. ¶ 154; (3) the defendant "breached its duty to [her] by negligently, recklessly, or indifferently supervising [her supervisor's] management of the staff attorneys and their work environment,"  id. ¶ 155; and (4) Covington's "supervision of or failure to supervise [her supervisor] directly and proximately caused [her] physical, psychic [sic], reputational, and monetary injury," id. ¶ 156.  The prevention of racial discrimination in the workplace is not a common law duty upon which a claim of negligent supervision may be based.  Accord Griffin, 925 A.2d at 576 ("[T]he common law did not recognize an employer's duty to prevent the sort of sexual harassment alleged in the appellant's complaint.").  Therefore, because her complaint does not allege that the defendant breached any common law duty, the plaintiff's claim of negligent supervision must be dismissed.

## IV.  CONCLUSION

For foregoing reasons, Covington's motion to dismiss must be granted in part and denied in part.[6]

_____/s/_____
Reggie B. Walton
United States District Judge

---

[6]     An Order consistent with the Court's ruling accompanies this Memorandum Opinion.