## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————
                                              )
YOLANDA YOUNG ,                               )
                                              )
            Plaintiff,                        )
                                              )
      v.                                      )      Civil Action No. 09-464 (RBW)
                                              )
COVINGTON & BURLING LLP,                      )
                                              )
            Defendant.                        )
———————————————————————)

## MEMORANDUM OPINION

The plaintiff, Yolanda Young, brought this lawsuit against the defendant, the law firm of

Covington & Burling, LLP ("Covington"), asserting that the defendant violated Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (2006), the District of Columbia Human Rights

Act ("DCHRA"), D.C. Code § 2-1402.11(a)(1) (2006), and section 1981 of the Civil Rights Act

of 1866, 42 U.S.C. § 1981 (2006), when it allegedly discriminated against her based on her race

during her employment at Covington and then retaliated against her based on her complaints

about the purported discrimination.  First Amended Complaint ("Am. Compl.") ¶¶ 1-4.  This case

is now before the Court on the Defendant's Motion for Summary Judgment ("Def.'s Mot.").

After carefully considering the parties' arguments,[1] and the entire record in this case, the Court

concludes that the plaintiff has failed to demonstrate a genuine issue of material fact with respect

---

[1]      In addition to the First Amended Complaint and the defendant's motion, the Court considered the following
submissions and their supporting exhibits in rendering its decision: the Defendant's Memorandum of Points and
Authorities in Support of its Motion for Summary Judgment ("Def.'s Mem."); the Defendant's Statement of
Undisputed Material Facts in Support of its Motion for Summary Judgment ("Def.'s Stmnt."); the Plaintiff's
Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"); the Plaintiff's Statement of Genuine
Issues ("Pl.'s Stmnt."); and the Defendant's Reply Memorandum in Support of its Motion for Summary Judgment
("Def.'s Reply").

to any of the six claims remaining in this lawsuit that would preclude the resolution of this case by summary judgment.[2]  Accordingly, the defendant's motion will be granted.

# I. BACKGROUND

The plaintiff is an African-American female.  Am. Compl. ¶ 7.  She "graduated from the Georgetown University Law Center in May 1995[,] with a C/C+ average."  Def.'s Stmnt. ¶ 63.  In the years following her graduation from law school, from 1995 until 2005, Def.'s Mot., Exhibit ("Ex.") A at 4 (November 23, 2009 Deposition of Yolanda Young ("Young Depo.") 17:17-23:14),[3] the "plaintiff has worked as a temporary contract lawyer at 10 to 15 [different] law firms[,] performing document reviews" at each firm.  Def.'s Stmnt. ¶ 66.  She "has never worked as an associate in a law firm[,] nor as a lawyer for the government[,] a company, or a non-profit" organization.  Id. ¶ 65.

As noted above, Covington is a law firm.  Am. Compl. ¶ 12.  Its largest office, consisting of approximately 1,000 attorneys and staff, is located in Washington, D.C.  Def.'s Stmnt. ¶ 1.  In February 2005, after the plaintiff submitted an application to Covington for a position as a staff attorney—and only as a staff attorney, Young II, 740 F. Supp. 2d at 23, n.5—Covington hired

---

[2]        The plaintiff filed her First Amended Complaint on August 21, 2009, alleging seven counts against the defendant:  Count I, Discriminatory Job Assignment and Promotion; Count II, Adverse Impact and Effect of Job-Assignment Policy and No-Promotion Policy; Count III, Discriminatory Treatment and Harassment; Count IV, Retaliation; Count V, Wrongful Termination; Count VI, Discriminatory Subterfuge; and Count VII, Negligent Supervision.  See Am. Compl. ¶¶ 114-156.  On September 9, 2010, the Court dismissed the plaintiff's negligent supervision claim (Count VII).  Young v. Covington & Burling LLP, 736 F. Supp. 2d 151, 163-64 (D.D.C. 2010) ("Young I"), and on September 21, 2010, the Court granted summary judgment to the defendant on the discriminatory job-assignment component of the plaintiff's disparate-impact claim (Count II), Young v. Covington & Burling, LLP, 740 F. Supp. 2d. 17, 23 (D.D.C. 2010) ("Young II").  Covington's current motion seeks "summary judgment on Counts I, III, IV, V, VI, and the remaining non-promotion claim in [C]ount II." Def.'s Mem. at 3.

[3]        The defendant's motion for summary judgment contains an appendix consisting of numerous exhibits.  Many of these exhibits are further subdivided into discrete components.  For example, Exhibit A consists of excerpts from the plaintiff's deposition and twenty-four exhibits introduced during that deposition.  For ease of reference, the Court will cite these exhibits by the page number assigned by the Court's electronic docket system and then identify the nature of the cited material in a parenthetical.

the plaintiff, who was employed as a staff attorney until August 2007.[4]  Pl.'s Opp'n, Ex. 3

(Affidavit of Yolanda Young ("Young Aff.") ¶ 7; Am. Compl. ¶ 7.

     A.  <u>Covington's anti-harassment/anti-retaliation Policies and Procedures</u>

     Covington's Policies and Procedures handbook explains that the firm "strive[s] to provide

a work environment free of sexual, racial[,] or other unlawful harassment."  Def.'s Mot., Ex. A at

45 (Covington's Policies and Procedures).  In relevant part, Covington's Policies and Procedures

provides:

> All supervisory and management personnel and all lawyers are responsible for
> ensuring adherence to the Firm's equal employment opportunity policy. They are
> also expected to take immediate and appropriate action to prevent or stop any
> racial harassment, sexual harassment or other improper harassment of employees
> in the workplace of which they become aware, whether by Firm personnel or by
> individuals outside the Firm. Any individual who violates the Firm's equal
> employment opportunity policy will be subject to appropriate disciplinary action,
> up to and including termination.

> Any employee who believes that he or she has been the subject of sexual, racial or
> other unlawful discrimination, or the victim of sexual, racial or other unlawful
> harassment, should bring the matter to the attention to any of the following: (1)
> his or her supervisor, (2) the Chief Human Resources Officer, (3) the Executive
> Director, (4) the Managing Partner for Operations, (5) the Managing Partners for
> Legal Personnel, (6) the Office Director or (7) the Office Managing Partner. If an
> employee is dissatisfied with the action taken by one of these persons, the
> employee may ask for an additional review of the matter by the Employment
> Review Committee. Any such complaints will be investigated as promptly as
> reasonably possible. Confidentiality will be maintained to the extent practical and
> appropriate under the circumstances.

> The Firm will not retaliate, nor will it tolerate any attempt at retaliation, against a
> person who raises employment discrimination or harassment concerns in good
> faith. Retaliation is a serious violation of the Firm's policy. Concerns about
> attempted retaliation should be raised (and will be handled) in the same manner as
> any other concern about equal opportunity.

---

[4]     The Court notes that the plaintiff's affidavit in support of her opposition to the defendant's motion at one point states she was hired by Covington in February 2007, Young Aff. ¶ 3, and at another point states that her employment commenced in February 2005, <u>id.</u> ¶ 7.  Despite this discrepancy, it is clear from the record in this case that the plaintiff was employed by Covington from February 2005 to August 2007.  Am. Compl. ¶ 8.

Id.  The plaintiff was aware of these policies and procedures.  Def.'s Mot., Ex. A at 13 (Young Depo. 60:8-60:17).

     B.  Covington's staff attorney program

     In 2005, Covington created a staff attorney program "to handle the review of electronic documents in large litigations."  Def.'s Stmnt. ¶ 2.  "Five to ten staff attorneys were generally assigned to a work room, where each had a desk and a computer on which to review electronic documents."  Id. ¶ 4.  Although the number of staff attorneys employed by Covington varied depending on the firm's workload, by June 2006, the number of staff attorneys had reached 102. Id. ¶ 2.  That number fluctuated between 40 and 80 over the next two years.  Id.  No new staff attorneys were hired after February 2008.  Def.'s Mem. at 3.  In the fourth quarter of 2009, Covington decided to terminate the program, and by the end of 2009, after laying off staff attorneys as the matters they worked on came to closure, the firm employed only 20 staff attorneys.  Def.'s Stmnt. ¶ 2.  Twenty-two former staff attorneys moved to other positions within the firm, eight to the lower paid project attorney position and fourteen to the position of senior staff attorney, which involved coordinating the work done by third-party contract attorneys. Def.'s Mem. at 3-4.  "In all, Covington hired 170 staff attorneys as part of the program in D.C. [started] in 2005."  Def.'s Stmnt. ¶ 3.  Not one of the 170 staff attorneys hired in the same staff attorney program as the plaintiff, the program created in 2005, was ever promoted to the position of associate, counsel, or partner.  Def.'s Mem. at 1, 6; Young Aff. ¶ 15.

     Applicants for staff attorney positions were required to be members of the District of Columbia Bar and to have previous document review experience.  Def.'s Mot., Ex. C at 23 (December 16, 2009 Deposition of Patrick Davies ("Davies Depo.") 120:14-21).  The grades and law school of an applicant for a staff attorney position were less important than previous

document review experience, id. (Davies Depo. 121:16-122:3), which was ascertained through a review of resumes, id. (Davies Depo. 122:4-5). The hiring criteria for staff attorneys was thus unlike the hiring criteria for associates, which was "extremely elaborate and detailed." Def.'s Mot., Ex. D at 12 (Huvelle Depo. 44:18-19). With a hiring process that begins with an on-campus interview, prospective associates are evaluated on "analytic ability, . . . writing ability, commitment to excellence in their work, willingness to work hard, collegiality, the ability to work effectively with others, interest in the private practice of law, [and the] ability to communicate." Id. at 12-13 (Huvelle Depo. 45:18-46:4). Prospective associates are also evaluated as participants in a summer program before being offered full-time employment at Covington. Def.'s Mot., Ex. C at 38 (Davies Depo. 184:11-21).

In March 2005, Patrick Davies, a partner at Covington, was placed in charge of the staff attorney program, but it was the associates of the firm assigned to the matters worked on by staff attorneys who were generally "responsible for providing guidance to the staff attorneys and overseeing the quality of the work product." Def.'s Stmnt. ¶ 5. In 2006, the plaintiff was one of several staff attorneys assigned to a litigation matter overseen by Caroline Reid, then an associate at Covington. Id. ¶ 10; Young Aff. ¶ 18. "For a period of time in 2006, [the] plaintiff shared an office with, among others, staff attorneys Sarah Wittig, Vanessa Natale, Kim Brown, and Heidi Riviere." Def.'s Stmnt. ¶ 7.

C. The plaintiff's request for training

On March 21, 2006, the plaintiff "overhead Ms. Natale discussing information given to her and [Ms.] Brown by [Ms. Reid] regarding" the coding of documents for the document review project on which the plaintiff, Ms. Brown, and Ms. Natale were all working. Young Aff. ¶ 58. The plaintiff then e-mailed Ms. Reid, asking that "clarification[s] made on documents or office

policy" be communicated "via group e[-]mail." Id. ¶ 59. In her reply to the plaintiff's e-mail, Ms. Reid acknowledged that she had "responded to some questions lately, but . . . thought they were just applicable to those individuals' documents." Id. "Sometime later," id. ¶ 60, the plaintiff overheard other staff attorneys discussing a "quicker, more efficient way of coding documents," which concerned her because staff attorneys were "evaluated" based on how quickly they performed their work, id. When the plaintiff e-mailed Ms. Reid about the additional training she believed the "white staff attorneys" had been given, Ms. Reid responded within two minutes and suggested that the plaintiff come to her office. Def.'s Stmnt. ¶ 12; Def's Mot., Ex. A at 16 (Young Depo. 70:14-20). At the plaintiff's request, Ms. Reid then provided the plaintiff with the coding training. Young Aff. ¶ 60; Def.'s Stmnt. ¶ 13; Def.'s Mot, Ex. A at 17 (Young Depo. 74:6-74:9).

      D. <u>The Wikipedia incident, the plaintiff's complaint to Pat Davies concerning the incident, and Mr. Davies' response</u>

According to the plaintiff, on December 9, 2005, one white, female staff attorney began reading "aloud . . . racial slurs and their definitions from a Wikipedia page." Young Aff. ¶¶ 27, 30, 31. The slurs allegedly disparaged "Hispanics, Asians, blacks, and bi-racial groups." Id. ¶ 30. After unsuccessfully attempting "to block out the conversation" she was hearing, the plaintiff heard the offending staff attorney ask if anyone knew the meaning of the word "'hapa.'" Id. ¶¶ 32-33. Receiving no answer, the staff attorney who had asked the question volunteered that she believed "it was the Haw[ai]ian equivalent of the word 'nigger.'" Id. ¶ 33. While these comments were being made, the plaintiff exchanged e-mails with another African-American staff attorney, Heidi Riviere, regarding what was being said, Def.'s Stmnt. ¶ 20, e-mails that she decided to save because she "knew that if [the staff attorney reading the slurs] could use such a

word and not draw any admonishments from her co-workers[,] this type of outburst would likely become routine," Young Aff. ¶ 38.  And, she asserts that "it did" become routine.  Id.

More than three months later, on March 23, 2006, after learning from a fellow staff attorney that a supervisor had referred to the work room in which she worked as a "social room," Young Aff. ¶ 53, the plaintiff e-mailed Mr. Davies and expressed her belief that the number of people assigned to the work room was "problematic," Def.'s Stmnt. ¶¶ 16-17.  The plaintiff explained in her e-mail to Mr. Davies that she believed that "cliques" had formed within the group of staff attorneys assigned to her work room, which she asserted resulted in "a lack of teamwork."  Id. ¶ 17.  As proof of the existence of cliques within the work room, she pointed to the fact that some of the staff attorneys had discovered "a faster way to code documents," but had not shared that method with her.  Id.; see supra at 5.

In her March 23, 2006 e-mail to Mr. Davies, the plaintiff also made reference to "one . . . occasion," when a white staff attorney had read aloud a list of racist slurs from the website Wikipedia, Def.'s Mot., Ex. A at 54 (March 23, 2006 e-mail chain between Yolanda Young and Pat Davies ("March 23, 2006 Davies e-mail chain")), and explained that as a person of color, she had found this offensive.  Def.'s Stmnt. ¶¶ 18-19.  The plaintiff's exact words to Mr. Davies were:

> I am posed with the challenge of having to share a room with a group of people who talk incessantly.  Often the chatter is benign; however, it has on occasion veered into inappropriate terrain—some sexually overt references and on one unfortunate occasion a staff attorney was reading aloud a host of derogatory jokes based on different racial stereotypes.  As a person of color, I found this particularly offensive.

Def.'s Mot., Ex. A at 54 ("March 23, 2006 Davies e-mail chain").  Six minutes after receiving the plaintiff's e-mail, Mr. Davies asked the plaintiff to meet him "immediately."  Id.  The plaintiff observed that Mr. Davies was visibly "angry" and "upset" upon hearing about the Wikipedia

incident.  Def.'s Mot., Ex. A at 21 (Young Depo. 89:9-89:12).  Mr. Davies told the plaintiff that

he would fire the employee who had read the derogatory slurs, but the plaintiff asked that he

instead simply move that staff attorney to a different work room.  Def.'s Mem. at 5; Def.'s Mot.,

Ex. C at 5 (Davies Depo. 18:19-19:9); Def.'s Mot., Ex. C at 8 (Davies Depo. 31:4-31:19).  Mr.

Davies met with Sarah Wittig, the staff attorney who had read the Wikipedia comments aloud,

and informed her that her conduct was "stupid" and that she would be fired if similar conduct

occurred again.  Def.'s Mem. at 5.  Ms. Wittig was then moved to a new work room that same

afternoon.  Id. at 6.

  The next day, March 24, 2006, Mr. Davies met with all of the staff attorneys and, after

reading them the firm's policy on racial harassment, informed them that harassment would not be

tolerated.  Id.  At the conclusion of this meeting, Mr. Davies told a story about a pet monkey he

and his siblings had as a child.  Def.'s Mem at 12, n.1; Young Aff. ¶ 106.  Although the plaintiff

maintains that the manner in which Mr. Davies told the story was inappropriate and racially

charged because, she believes, he analogized the monkey to a staff attorney at Covington, Young

Aff. ¶¶ 107-109, the defendant asserts the story was told by Davies to convey that no excuses

would be tolerated for harassment, Def.'s Mem at 12, n.1.  The plaintiff maintains that she

"complained about this incident to Ms. Jessica Charles Turner and told her how it was hard [to

believe] that a Covington partner was unaware of the offensiveness of equating a monkey to a

black person."  Young Aff. ¶ 110.

  E. Staff attorney evaluations and bonuses

  In January or February 2006, almost a year after she began her employment with

Covington, the plaintiff was given her first evaluation.  Young Aff. ¶ 14.  "Covington awarded

bonuses in 2006 based on the total number of billable hours recorded by each staff attorney

[during the previous year]." Def.'s Mem. at 23. The plaintiff received a favorable review from

Mr. Davies, and therefore was given the maximum bonus for which she qualified, approximately

$9,000. Young Aff. ¶¶ 14-15; see also id. ¶ 22. According to the plaintiff, Mr. Davies told the

plaintiff that her billable hours and her evaluations were among the best at the firm. Id. ¶ 22. In

addition to the bonus, the plaintiff was also given a $2,500 salary increase. Id. ¶ 22.

The following year, 2007, Covington decided to base the bonuses for its 54 staff

attorneys it employed at that time on the ratings they received from the associates supervising the

document reviews to which the staff attorneys were assigned. Def.'s Mem. at 23-24. Mr. Davies

implemented this change in policy after concluding that overtime pay was sufficient

compensation for staff attorneys who worked a high number of hours and that hours-based

bonuses might create a disincentive for staff attorney efficiency. Id. at 24. The plaintiff did not

receive any high ratings for her performance in 2006, Def.'s Mot., Ex. A at 94-95 (December 19,

2006 Evaluation), and her bonus of $5,000 fell at the low end of the bonuses awarded to staff

attorneys. Id. However, the plaintiff did receive another $2,500 raise. Def.'s Mot., Ex. A at 30

(Young Depo. 142:18-143:10).

F. Accusations of overbilling

Mr. Davies sent the plaintiff an e-mail on October 17, 2006, in which he expressed his

belief that she had worked from home on a weekend day for over five hours in violation of the

billing policy for the case on which she was assigned. Young Aff. ¶ 161; Def.'s Mot., Ex. M at

576 (Ball Decl., Ex. H (October 17, 2006 e-mail chain between Yolanda Young and Patrick

Davies)). In that same e-mail, Mr. Davies informed the plaintiff that he had checked her

timesheet against the data on her entry keycard and "discovered that on two occasions [she] had

come in a half hour after the time [she] had recorded on [her] timesheet." Young Aff. ¶ 165.

The plaintiff committed to being more precise in her billing entries and did not object to Mr.

Davies reducing her overtime request for the pay period at issue by two hours.  Def.'s Mem. at

25; Def.'s Mot., Ex. M at 576 (Ball Decl., Ex. H (October 17, 2006 e-mail chain between

Yolanda Young and Patrick Davies)).  However, the plaintiff maintains that Mr. Davies and Ms.

Reid inaccurately believed that she was overbilling in October 2006.  Young Aff. ¶¶ 161, 162.

"[I]n October of 2006[,]" the plaintiff went to Ms. Reid's office and shared her belief that

"the way in which [Ms. Reid] handled the [time reporting] matter was not the way [the plaintiff]

believed [Ms. Reid had] ever handled the matter in the past with white staff attorneys."  Def.'s

Mot., Ex. A at 10 (Young Depo. 46:10-47:1).  The plaintiff asserts that she viewed her

discussion with Ms. Reid as a report of discrimination and that Ms. Reid did not remedy the

situation.  Id. (Young Depo. 47:6-47:15).  The plaintiff contends that the "tone" of Mr. Davies' e-

mail and the fact that Ms. Reid had, allegedly, falsely reported her for violating the billing policy

in regard to weekend work, indicated to her that they were only interested in "harassing" her, and

that this caused her to be "even more upset and stressed by [her] work environment."  Young

Aff. ¶ 171.  The plaintiff did not, however, seek additional review of the matter.  Def.'s Mot., Ex.

A at 10 (Young Depo. 47:16-47:19).

      G.  <u>The plaintiff's termination and application for reemployment</u>

Because Covington did not have enough document review work for all of its staff

attorneys, it terminated eight staff attorneys on August 14, 2007.  Def.'s Mem. at 7.  These eight

staff attorneys were selected for termination on the basis of (1) evaluations from associates who

worked with the staff attorneys, and (2) hours billed.  Id.  The eight attorneys terminated "were

the ones who ranked lowest in terms of either performance or hours, or the combination of

performance and hours."  Id.  Associates rated the staff attorneys on a scale of one to three, <u>id.</u>,

with three being the worst possible rating, Def.'s Mot., Ex. D at 18 (Huvelle Depo. 72:8-20).  Of the 65 staff attorneys evaluated on this scale, the plaintiff had the 64th worst performance evaluation.  Def.'s Mem. at 7.  The plaintiff was terminated based on her low performance ranking.  Id.

Several months later, on March 31, 2008, the plaintiff contacted Covington seeking reemployment, but was not rehired.  Id.; Young Aff. ¶¶ 195-196.  Covington had no available staff attorney positions at that time, and has not hired any staff attorneys since that date.  Def.'s Mem. at 7.

H.  The plaintiff's other allegations of discrimination

In addition to the Wikipedia incident, her request for training, Mr. Davies' monkey story, the overbilling accusations, her evaluations and bonuses, and her termination, the plaintiff alleges other instances of disparate treatment and discriminatory harassment.  See Am. Compl. ¶ 35.  These allegations include claims that Mr. Davies and other Covington partners and associates "communicated via [e-mail] and phone with white staff attorneys more often than they did with black staff attorneys," id. ¶ 35a; that Mr. Davies and white Covington partners socialized with white staff attorneys more than they did with black staff attorneys, id. ¶ 35b; that white partners "took more of an interest in cultivating the careers of white staff attorneys, id. ¶ 35c; that a white staff attorney downloaded a program that allowed her to monitor her dog at home through video streaming on her Covington computer, and that, upon seeing this video stream, another white staff attorney motioned his head toward the plaintiff and another black staff attorney, saying "'[the dog] looks like them,'" id. ¶ 35d; that the plaintiff saw an e-mail string between two white staff attorneys containing derogatory language about black staff attorneys, id. ¶ 35e; that, after a black staff attorney "complained about a fan blowing cold air in

11

one of the workrooms[, a] white staff attorney screamed at the black staff attorney, relating her heritage to her temperature discomfort," id. ¶ 35f; that a white staff attorney had used a tone during a meeting which suggested that "being black was undesirable," id. ¶ 35g; that the plaintiff overheard a white staff attorney tell a white associate that one of the black staff attorneys "'doesn't know any better,'" which the plaintiff understood "to mean that the black staff attorney lacked some cultural, social, or intellectual insight because of her race or ethnicity," id. ¶ 35h; that the plaintiff overheard a white staff attorney mimicking "the tone and speech pattern of [a] black employee," id. ¶ 35i; and that white staff attorneys "used racially charged language when discussing black people," often referring to African-Americans as "'those people,'" id. ¶ 35j. According to the plaintiff, she complained about some of this conduct and the problems she was having with the staff attorneys to Deborah Charles Turner,[5] a manager at Covington, even though she didn't necessarily believe that Ms. Turner was going to remedy them.  Def.'s Mot., Ex. A at 9-10 (Young Depo. 44:20-45:4).  The plaintiff also contends that she complained to Ms. Reid and Mr. Davies in March 2006 about the fact that white partners and associates socialized with white staff attorneys more than black staff attorneys.  Id. (Young Depo. 48:18-49:17).  She represents that she was dissatisfied with their responses, but did not seek further review of this issue.  Id. (Young Depo. 50:9-50:12).  The plaintiff acknowledges that she did not complain about the conduct identified in subparagraphs c, d, e, f, g, h, or i of her First Amended Complaint, admitting that she brought this conduct to the attention of "no one."  Id. (Young Depo. 50:13-53:21).

---

[5]     The Court notes that the plaintiff refers to Ms. Turner by two different names in two different filings.  See Def.'s Mot., Ex. A at 9-10 (Young Depo. 44:20-45:4) (stating that she complained about staff attorney conduct to Deborah Charles Turner); Young Aff. ¶ 110 (asserting that she expressed dismay to Ms. Jessica Charles Turner regarding Mr. Davies' monkey story).

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on an element of the claim based on that fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When ruling on a Rule 56 motion, the Court must view the evidence in the light most favorable to the nonmoving party. Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)). The Court must therefore draw "all justifiable inferences" in favor of the nonmoving party and accept the nonmoving party's evidence as true. Anderson, 477 U.S. at 255. The nonmoving party, however, cannot rely on "mere allegations or denials," Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248) (internal quotation marks omitted), because "conclusory allegations unsupported by factual data will not create a triable issue of fact," Pub. Citizen Health Research Grp. v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal brackets and quotation marks omitted). Indeed, to withstand a properly supported motion for summary judgment, the nonmoving party must cite materials in the record—such as depositions, documents, or declarations—and show that the materials cited establish a genuine dispute of material fact. See Fed. R. Civ. P. 56(c)(1)(A)-(B). Finally, a supporting or opposing affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify to the matters stated." Fed. R. Civ. P. 56(c)(4). If the Court concludes that "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she

13

has the burden of proof," then the moving party is entitled to summary judgment.  Celotex Corp.

v. Catrett, 477 U.S. 317, 323 (1986).

### III. LEGAL ANALYSIS[6]

The plaintiff's First Amended Complaint contains numerous allegations of employment

discrimination in violation of Title VII, the DCHRA, and § 1981.  "In addressing employment

discrimination claims under [the DCHRA and § 1981], courts look to the jurisprudence

surrounding Title VII."  Burt v. Nat'l Republican Club of Capitol Hill, No. 10-cv-1911, 2011 WL

6097981, at * 4 (D.D.C. December 8, 2011) (citing cases); see also Vatel v. Alliance of Auto.

Mfrs., 627 F.3d 1245, 1246 (D.C. Cir. 2011).  Title VII makes it unlawful for an employer "to

fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any

individual with respect to [her] compensation, terms, conditions, or privileges of employment,

because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  "Title VII prohibits both

intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices

---

[6]      In its reply in support of its motion for summary judgment, the defendant states that the plaintiff's
opposition "suffers" from a "serious defect[]" because it "blatantly disregards the requirements of Local [Civil] Rule
7(h)."  Def.'s Reply at 1.  The defendant argues that "all of the undisputed facts set out by Covington may therefore
be deemed admitted."  Id.  Local Civil Rule 7(h) provides that

> [a]n opposition to [a summary judgment] motion shall be accompanied by a separate concise
> statement of genuine issues setting forth all material facts as to which it is contended there exists a
> genuine issue necessary to be litigated, which shall include references to the parts of the record
> relied on to support the statement. . . . In determining a motion for summary judgment, the court
> may assume that facts identified by the moving party in its statement of material facts are
> admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to
> the motion.

Similarly, when a party "fails to properly address another party's assertion of fact," Federal Rule of Civil Procedure
56(e)(2) provides courts the ability to "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P.
56(e).  Rule of Civil Procedure 56, however, makes clear that a movant must show that it is "entitled" to summary
judgment, Fed. R. Civ. P. 56(a) & 56(e), suggesting that a court must always evaluate whether summary judgment is
warranted for the moving party.  Thus, even if the Court were to deem all of the facts set forth in the defendant's
Statement of Undisputed Material Facts as admitted by the plaintiff, the Court would nevertheless need to engage in
an analysis of whether those facts entitle the defendant to judgment as a matter of law.  When considered in
conjunction with the general judicial preference for resolving disputes on their merits, this duty to undertake an
analysis of the record counsels against deeming the facts set out by Covington as admitted by the plaintiff.

that are not intended to discriminate but in fact have a disproportionately adverse effect on

minorities (known as 'disparate impact')."  Ricci v. DeStefano, 557 U.S. 557, ___, 129 S. Ct.

2658, 2672 (2009).   Because the plaintiff's claims are premised on several different theories of

recovery, the Court will examine in turn each of the six counts at issue in this case.  See Def.'s

Mem. at 2-3 (identifying the counts remaining in this litigation and the challenges raised by the

defendant's motion).

  A. The plaintiff's discriminatory job assignment and promotion claims (Count I)

  In Count I of her First Amended Complaint, the plaintiff maintains that Covington's

policies and practices for attorney assignments and promotions discriminated against black staff

attorneys.  Am. Compl. ¶¶ 118-119.  Where there is no direct evidence of discrimination, courts

apply the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S.

792 (1973).  See Calhoun v. Johnson, 632 F.3d 1259, 1261 (D.C. Cir. 2011).  Accordingly,

because the plaintiff has not adduced direct evidence of discrimination, see Vatel, 627 F.3d at

1247 (noting that direct evidence of discrimination exists when "a statement . . . itself shows

racial or gender bias in the [employment] decision" alleged by the plaintiff to be discriminatory

or retaliatory), the Court will employ the McDonnell Douglas framework.  In accordance with

McDonnell Douglas, a plaintiff alleging discrimination in employment bears the burden of

establishing a prima facie case of discrimination.  "Under McDonnell Douglas, a common

element of a prima facie case for both disparate treatment discrimination and retaliation is thus

the requirement that [the] plaintiff suffered 'some form of legally cognizable adverse action by

the employer.'"  Lester v. Natsios, 290 F. Supp. 2d 11, 20 (D.D.C. 2003) (quoting Brown v.

Brody, 199 F.3d 446, 452 (D.C. Cir. 1999)).  An adverse action is "a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits." Douglas v. Donovan, 559 F.3d 549, 551-52 (D.C. Cir. 2009).  And this Court has previously ruled that the plaintiff did not suffer an adverse employment action in regard to her hiring because she applied for only the position of staff attorney—the position for which she was hired.  See Young II, 740 F. Supp. 2d at 23 ("Therefore, because the defendant hired the plaintiff for the only position for which she sought employment, the Court finds that no adverse employment action resulted from that decision.").  Accordingly, the plaintiff is unable to make out a prima facie case of discriminatory job assignment and judgment on this claim must be entered in favor of the defendant as a matter of law.[7]

Similarly, the satisfaction of a prima facie case of discriminatory failure to promote requires a plaintiff to show:

> that [s]he is a member of a protected class; that [s]he applied and was qualified for the promotion at issue; that despite [her] qualification, [s]he was rejected; and that, after [her] rejection, the position remained open and the employer continued to see applicants who were no more qualified than [the] plaintiff.

---

[7]     The Court is familiar with the Circuit's opinion in Brady v. Office of the Sergeant at Arms, 520 F.3d 490 (D.C. Cir. 2008), which makes clear that

> in a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas. Rather, in considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

Id. at 494 (emphasis in original).  The District of Columbia Circuit has thus established two prerequisites for the application of Brady: first, the finding of an adverse employment action; and, second, the employer's articulation of a legitimate, nondiscriminatory reason for the adverse employment action.  Accordingly, because the Court has determined that the plaintiff did not suffer an adverse employment action when she was hired as a staff attorney, granting summary judgment on the basis of the plaintiff's failure to satisfy the prima facie case—one element being the demonstration of an adverse employment action—does not contravene the Circuit's instruction in Brady.

Lester, 290 F. Supp. 2d at 20 (citing McDonnell Douglas, 411 U.S. at 802); see also Valentino v. United States Postal Serv., 674 F.2d 56, 63 (D.C. Cir. 1982) (setting forth the prima facie case factors necessary to establish a discriminatory refusal to promote claim).

The plaintiff's failure to promote claim fails because the record does not show that the plaintiff ever applied for, or was qualified for, a promotion to a non-staff attorney position. Rather, the plaintiff's own affidavit merely asserts that she expressed the desire to be promoted and was told that this was not possible. See, e.g., Young Aff. ¶¶ 15, 16, 68. The plaintiff asserts that "[a]t the time [she] was hired, [she] believed that [she] could be promoted." Id. ¶ 7. Her deposition testimony, however, reveals that this belief appears to have been based on her own assumptions and nothing conveyed to her by Covington:

> Q. When you were interviewed . . . the position of staff attorney was described to you; correct?
> A. Correct.
> Q. And you were told that there was no promotion prospects related to the position of staff attorney; weren't you?
> A. I don't recall that.
> Q. . . . You don't recall being told that there was any possibility of your being promoted to a staff attorney; were you?
> A. No.
> Q. You don't recall one way or the other; is that your testimony?
> A. Correct.

Def.'s Mot., Ex. A at 8 (Young Depo. 36:2-21). The plaintiff acknowledges that she was clearly advised later by Mr. Davies that her promotion from the staff attorney position was not a possibility. Specifically, the plaintiff explains that while meeting with Mr. Davies in early 2006 to receive her bonus she "expressed [her] desire to be promoted and asked [him] how this could happen. While [she does not] remember his exact words, [she does] recall leaving with the impression that promotion was not a possibility." Young Aff. ¶ 15; see also id. ¶ 16 (after other staff attorneys inquired about promotions, "Mr. Davies would immediately dismiss the notion

that staff attorneys could be promoted").  Indeed, the plaintiff's own complaint states that "[i]t would have been futile for [the p]laintiff and others similarly situated to her to apply for an associate position," Am. Compl. ¶ 128, which confirms that she never applied for a promotion. At best, then, the plaintiff's own affidavit shows that she expressed her desire to be promoted. Moreover, it is undisputed that no staff attorney who was employed through the staff attorney program created in 2005 was ever promoted to an associate position, Young Aff. ¶ 15 ("During my tenure at Covington, no staff attorney from our group was promoted."); see also Def.'s Mem. at 17-18 ("It is undisputed that none of the 170 staff attorneys hired in the same program as the plaintiff—whether white, Asian, Hispanic, or African-American—was promoted to a position as association, counsel, or partner."), which corroborates the defendant's assertion that it did not promote staff attorneys.  Accordingly, the plaintiff has not demonstrated the existence of a genuine issue of material fact with respect to her having applied for, and being qualified for, promotion from staff attorney to associate.  The defendant is therefore entitled to summary judgment on the nonpromotion component of Count I of the First Amended Complaint.[8]

---

[8]        Again, the Court is well aware of the Circuit's holding in Brady and its instruction to discount the prima facie case at the summary judgment stage.  Brady, 520 F.3d at 494.  But, much like the plaintiff's discriminatory job assignment claim, the Court finds an adverse employment action lacking as the plaintiff has not shown that she ever actually applied for a promotion.  In any event, the Circuit has cautioned that establishing a prima facie case is not onerous.  Brady, 520 F.3d at 494 n.2.  The Court will therefore assume, for the sake of engaging in a Brady analysis, that the plaintiff's expressed desire to be promoted, Young Aff. ¶ 15, amounted to an application for a promotion. The Court will further assume that Covington's argument that it did not promote staff attorneys can be read as the articulation of a legitimate, nondiscriminatory reason for not promoting the plaintiff, and that the two Brady prerequisites have thus been satisfied.  The question then becomes whether the plaintiff has produced sufficient evidence from which a reasonable jury could determine that Covington's reason for not promoting the plaintiff was a pretext for discrimination.  Brady, 520 F.3d at 494.  On the record before the Court, the answer to this question is that Covington's explanation was not pretextual, as the plaintiff herself admits that no staff attorneys hired under the 2005 program were ever promoted.  Young Aff. ¶ 15.

B.  The plaintiff's claim that Covington's nonpromotion policy had a disparate impact on African-Americans (Count II)

In Count II of her First Amended Complaint, the plaintiff contends that Covington's "policy and practice banning the promotion of staff attorneys ha[d] an adverse impact on black attorneys in violation of Title VII and ha[d] the effect of violating the provisions of the DCHRA."  Am. Compl. ¶ 126.  The plaintiff asserts that "[m]inorities ma[d]e up a disproportionate number of staff attorneys who would have been in contention for a promotion in July of 2007," Pl's Opp'n at 1, and that

> [b]ecause the number of black staff attorneys [wa]s disproportionate to the number of white staff attorneys and given the comparatively lower total number of black lawyers nationally and locally and given the comparatively lower total number of lawyers practicing with [the d]efendant as partners, counsel, or associates, [the d]efendant's nonpromotion policy disproportionately impact[ed] blacks.

Am. Compl. ¶ 29 (emphasis omitted).  The defendant, on the other hand, argues that the plaintiff's attempt to base her prima facie case of disparate impact on a comparison of the percentage of African-American staff attorneys employed by Covington to the percentage of African-Americans employed as associates, counsel, or partners is improper under existing disparate impact jurisprudence.  See Def.'s Mem. at 18-19 (citing the Supreme Court's analysis of employee qualifications in Wards Cove Packing Co. v. Antonio, 490 U.S. 642 (1989)).  As explained below, the Court agrees with the defendant.

"Under the disparate-impact statute, a plaintiff establishes a prima facie violation by showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of race . . . .'"  Ricci, 557 U.S. at __, 129 S. Ct. at 2673 (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)).  In other words, a plaintiff alleging a disparate impact claim "must first identify the specific employment practice that is challenged," and then "must establish causation; 'that is,

the plaintiff must offer statistical evidence <u>of a kind and degree</u> sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.'" <u>Onyewuchi v. Mayorkas</u>, 766 F. Supp. 2d 115, 130 (D.D.C. 2011) (quoting <u>Watson v. Fort Worth Bank & Trust</u>, 487 U.S. 977, 994 (1988)) (emphasis added).  The plaintiff's evidence of causation "must establish that the employment practice 'select[s] applicants for hire or promotion in a . . . pattern significantly different from that of the pool of applicants.'" <u>Onyewuchi</u>, 766 F. Supp. 2d at 130 (quoting <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 425 (1975)); <u>see also</u> <u>Carpenter v. Boeing Co.</u>, 456 F.3d 1183, 1196 (10th Cir. 2006) (explaining that the statistics offered to support causation "must . . . relate to the proper population. . . . The essential requirement is that the [statistical] data concern those persons subject to the challenged employment practice."); <u>Stout v. Potter</u>, 276 F.3d 1118, 1123 (9th Cir. 2002) (noting that"[t]he first step in a statistical analysis is to identify the base population for comparison.").  Simply put, the plaintiff must produce statistical evidence from which a reasonable jury could determine that Covington's nonpromotion policy <u>caused</u> the statistical disparity in question, <u>see</u> <u>Watson</u>, 487 U.S. at 997 (explaining that the "ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff at all times."); <u>Onyewuchi</u>, 766 F. Supp. 2d at 131 (explaining that "causation is established through statistical evidence"), which she has failed to do.

It strikes the Court that the plaintiff created a nearly insurmountable task for herself in aiming her disparate impact challenge at the defendant's nonpromotion policy, as there is no statistical data that can show that Covington's nonpromotion policy adversely impacted African-American staff attorneys.  This is because no statistical comparisons can be drawn between

"those persons subject to the challenged employment practice." Carpenter, 456 F.3d at 1196

(10th Cir. 2006).  Specifically, no statistical disparity exists between white staff attorneys who

were promoted and black staff attorneys who were promoted because not one person from either

group (or for that matter any other racial group) was ever promoted.  Accordingly, the

nonpromotion policy did not independently adversely impact African-Americans as a group;

rather, it adversely impacted all staff attorneys.[9]  The plaintiff's claim that the defendant

"relegates its black attorneys to its lowest rung of practicing attorneys by consigning their

majority to earning less money, performing less challenging work, and enjoying less opportunity

for professional growth," Am. Compl. ¶ 1, must take into account the hiring practices that

"increased the number of staff attorneys it employed in [its Washington, D.C. office] . . .

coinciding with the largest number of black attorneys [Covington] had ever hired," Am. Compl.

¶ 22.  Indeed, the plaintiff's own complaint seems to recognize a connection between the hiring

criteria utilized by the defendant to fill the positions in its staff attorney program, the

nonpromotion policy, and the number of African-Americans employed as staff attorneys.  See id.

¶¶ 22, 27, 28.  Consequently, to meet her prima facie case burden of "offer[ing] statistical

evidence of a kind and degree sufficient to show that the practice in question has caused the

exclusion of applicants for jobs or promotions because of their membership in a protected

group," Watson, 487 U.S. at 994, the plaintiff would, it seems, need to produce statistical

---

[9]     The record reflects that the defendant promoted individuals from lower positions to the position of associate on three occasions.  Joe Kresse was promoted from the position of litigation specialist to the position of associate "years before" 2005.  See Def.'s Mot., Ex. C at 33-34 (Davies Depo. 165:1-168:10).  Eric Phelps was promoted from the position of paralegal specialist to associate.  Def.'s Mot., Ex. D at 15 (Huvelle Depo. 56:6-57:5).  And an African-American woman (whose name is not disclosed in the record) was promoted from the position of contract attorney to associate in the defendant's New York office.  Id. at 15 (Huvelle Depo. 54:14-55:4).  These promotions are of no significance to the plaintiff's claims, however.  First, the plaintiff's claim is that it is the position of staff attorney to which the defendant "systematically relegates," Am. Compl. ¶ 1 African-Americans, and the plaintiff concedes that this program was not created by the defendant until 2005, id. ¶ 18.  Second, none of these promotions were from the position of staff attorney.  Thus, because the plaintiff's disparate impact claim focuses on staff attorneys who "would," Pl.'s Opp'n at 1, have been eligible for promotion in 2007, the Court need not take into account individuals who never held the position of staff attorney.

evidence demonstrating that African-Americans who were qualified for and applied for associate positions were nonetheless hired as staff attorneys rather than associates in greater numbers than whites who also tendered applications for employment as associates.  In other words, the pertinent statistical comparison would demonstrate that African-Americans, more so than whites, who sought and were qualified to be associates bore the brunt of the nonpromotion policy because they were hired as staff attorneys in numbers disproportionate to the number of similarly situated white attorneys.  Beginning with the nonpromotion policy ignores the first half of the equation, which is the defendant's hiring practices that, according to the plaintiff, resulted in African-Americans being subjected to the nonpromotion policy in numbers disproportionate to the number of whites who were also subjected to the same policy.  At no point during this litigation, however, has the plaintiff produced statistics that speak to the hiring practices used to compose the defendant's pool of staff attorneys ineligible for promotion.

As the foregoing indicates, the Court is of the opinion that, for her disparate impact claim to be successful, the plaintiff's evidence must have included an evaluation of the hiring practices used by the defendant in recruiting and hiring the staff attorneys who were then subjected to the nonpromotion policy.  Nonetheless, the Court is satisfied that the plaintiff has identified an employment practice used by the defendant that allegedly had a disparate impact—the nonpromotion policy.  See Onyewuchi, 766 F. Supp. 2d at 131(explaining how the 1991 amendments to Title VII altered what a plaintiff must show to identify the challenged employment practice).  Accordingly, the Court must examine the statistical evidence that the plaintiff offers in support of her claim that the defendant's nonpromotion policy caused the statistical disparity she has identified as the basis for her disparate impact claim.

Rather than focusing on the hiring practices used by the defendant to build its staff attorney program, the plaintiff simply contends that "[m]inorities make up a disproportionate number of staff attorneys who would have been in contention for a promotion in July of 2007." Pl.'s Opp'n at 1.  Here, again, the plaintiff's statistical evidence is flawed.  The plaintiff merely offers a statistical comparison between the percentage of African-American staff attorneys employed by the defendant and the percentage of African-Americans employed by the defendant in the positions of associate, counsel, or partner in support of her claim that the defendant's staff attorney nonpromotion policy adversely impacted African-Americans without taking into account the different and more rigorous qualifications necessary for selection to Covington's non-staff attorney positions.  See Am. Compl. at 7 (including a chart reflecting the distribution of practicing attorneys at Covington in the years 2005, 2006, 2007, and 2008).  While this statistical disparity was deemed sufficient to allow the plaintiff's nonpromotion disparate impact claim to survive the defendant's Rule 12(b)(6) challenge, see Young I, 736 F. Supp. 2d at 163, at this stage of the proceedings, where the defendant has moved for summary judgment, the plaintiff must do more than point to a statistical disparity; the plaintiff must adduce evidence from which a jury could reasonably find that Covington's nonpromotion policy caused adverse consequences for African-Americans.  The Court must therefore hone its attention on the "kind and degree" of the plaintiff's statistical evidence.  Watson, 487 U.S. at 994.  And, in evaluating the statistical evidence offered by the plaintiff as proof of causation, it is clear that the statistical evidence need not take into account "'every conceivable factor relevant to a (high level) promotion decision' . . .[,] but 'the minimum objective qualifications necessary for one to be eligible for promotion must be considered.'"  Valentino, 674 F.2d at 68 (quoting Davis v. Califano, 613 F.2d 957, 964 (D.C. Cir. 1980)); see also Anderson v. Zubieta, 180 F.3d 329, 342 (D.C. Cir. 1999) ("It is true that in

order to eliminate the most common nondiscriminatory explanation for a disparity—lack of

qualifications—a plaintiff's prima facie case must take into account the 'minimum objective

qualifications' for the position at issue." (quoting Segar v. Smith, 738 F.2d 1249, 1274) (D.C.

Cir. 1984))).[10]  The plaintiff's failure to "grapple with the qualifications" required to fulfill the

responsibilities of a staff attorney, as compared to the qualifications necessary to perform the

responsibilities of Covington's associates, counsel, and partners, is "fatal to her case."  Valentino,

674 F.2d at 67.

The record contains ample evidence of the different job responsibilities undertaken by

staff attorneys and the defendant's other attorney workforce.  First, the plaintiff acknowledges

that staff attorneys "primarily perform online document review," Am. Compl. ¶ 18, and that she

understood this would be her primary task as a staff attorney at Covington, see Def.'s Mot., Ex.

A at 39 (February 10, 2005 Application of Yolanda Young) (indicating that she was qualified for

the job of staff attorney because she had "worked as a contract attorney for several years and

[understood] that the [Covington] job is similar"); Def.'s Mot., Ex. A. at 6 (Young Depo. 26:9-

12).  Indeed, the plaintiff's deposition testimony makes clear that she "knew . . . that the duties

and responsibilities of a contract lawyer were different from the duties and responsibilities of an

associate."  Def.'s Mot., Ex. A. at 6 (Young Depo. 26:3-8); see also id. (Young Depo. 27:1-4

(acknowledging that she knew, at the time of her application for the position of staff attorney,

that associates earned higher salaries than staff attorneys).  Second, the number one qualification

---

[10]      The Court acknowledges that Valentino involved a disparate treatment claim of discriminatory refusal to promote, rather than a disparate impact claim as alleged by the plaintiff in this case.  674 F.2d at 60 n.1. Nonetheless, the Circuit's analysis of the plaintiff's class claim compelled it to recognize that "[i]n Title VII class actions, statistical proof is a prominent part of the prima facie case."  Id. at 68.  Accordingly, although written in connection with statistical evidence in the context of a disparate treatment class claim, as opposed to a disparate impact claim, Valentino's analysis of both the role that statistics play in establishing a prima facie case and the composition of those statistics is relevant to and instructive on the question before the Court.

the defendant looked for in hiring staff attorneys was prior experience conducting document

review.  See Def.'s Mot., Ex. C at 23-24 (Davies Depo. 121:20-122:3); id. (Davies Depo 122:17-

123:9); Def.'s Mot., Ex. D at 7 (Huvelle Dep. 19:7-10).  Third, the hiring criteria for staff

attorneys and for associates was quite different.  Compare Def.'s Mot., Ex. D at 12 (Huvelle

Depo. 44:16-49:19) with Def.'s Mot., Ex. D at 7 (Huvelle Depo. 18:19-21:16).  Fourth, while

associates may also be tasked with conducting document review, Def.'s Mot., Ex. D at 9

(Huvelle Depo. 31:16-22), document review was not their principal responsibility, Def.'s Mot.,

Ex. C at 25 (Davies Depo. 126:6-11) (explaining that "associates do legal research" and that

doing research is not the "nature of the job" of a staff attorney); Def.'s Mot., Ex. D at 11 (Huvelle

Depo. 40:18-41:8) (stating that the staff attorney program was created in 2005 so that

Covington's "associates did not have to do the work"); Def.'s Mot., Ex. D at 14 (Huvelle Depo.

52:4-8, 20-21) (explaining that associates were sometimes hired who "specialize[d]" in one

practice area or to fill "niche practices"); Def.'s Mot., Ex. D at 18 (Huvelle Depo.70:5-6)

(observing that associates supervise the work performed by staff attorneys).  Fifth, the record

makes clear that the positions of associate, counsel, and partner require different capabilities and

command different responsibilities.  Id. at 22 (Huvelle Depo. 88:15-16) (noting that "[o]ut of the

many associates at the firm, relatively few become partners"); id. at 12 (Huvelle Depo. 42: 18-

21) (listing the categories of attorneys employed by the defendant).  Once the staff attorneys

coded the documents in conjunction with conducting their document reviews to make the

documents "accessible through an electronic system," associates and partners evaluated those

documents to assess their relevance in cases being handled by the firm.  See Def.'s Mot., Ex. D at

9 (Huvelle Depo. 30:22-31:4).  Finally, and perhaps most important, in explaining why it was

unlikely that a staff attorney would ever be eligible to be promoted to an associate, Mr. Davies

explained that staff attorneys "didn't have the same criteria that was required for an associate." Def.'s Mot., Ex. C at 33 (Davies Depo. 162:15-17).  In light of this evidence, the plaintiff's assertion that staff attorneys "would" have been "in contention for a promotion," Pl.'s Opp'n at 1, is not convincing, as there is no doubt that the defendant's staff attorneys performed fewer and less skilled tasks associated with the processing and litigation of cases than did Covington's associates, counsel, and partners.  Quite simply, the plaintiff's statistical comparison between the percentage of African-American staff attorneys and the percentage of African-American attorneys employed by the defendant in other capacities provides no basis on which the Court can assess the respective qualifications of the different groups.  See Valentino, 674 F.2d at 227 (opining that the plaintiff's "exhibits provide no basis for comparing men and women similarly educated and equipped to pursue the same occupations").  And this Circuit has emphasized the point that "[w]hen it is clear that qualification, e.g., as an economist, engineer, lawyer, computer expert, statistician, accountant, business manager, secretary, is a prime factor in the selection process, a Title VII plaintiff cannot shy away from that factor in developing her prima facie case."  Id. at 228; see also id. at 228 n.27 (explaining that "[p]roof that discrimination exists within occupational categories may well support an inference of workplace-wide discrimination," and noting that the court's "sole point is that, in the first instance, comparisons must hone in on similarly qualified employees").

    In summary, after discounting the plaintiff's comparison of the percentage of African-American staff attorneys to the percentage of other African-American attorneys at Covington as improper statistical evidence of causation, the plaintiff has failed to offer any evidence, much less statistical evidence, demonstrating that Covington's staff attorney nonpromotion policy had a

disparate impact on African-Americans.  The defendant is therefore entitled to judgment as a matter of law on the plaintiff's disparate impact claim.

     C.  <u>The plaintiff's discriminatory treatment and harassment claims (Count III)</u>

     The plaintiff alleges that Covington's "managers and employees harassed [her] on the basis of her race and treated her differently than her white coworkers in violation of Title VII, § 1981, and the DCHRA."  Am. Compl. ¶ 131.  In Count III, the plaintiff advances two separate theories of recovery under Title VII, disparate treatment and hostile work environment, Am. Compl. ¶ 131, each of which the Court will examine in turn.

     1.  <u>The Hostile Work Environment Claim</u>

     "A claim of [racial] harassment is cognizable under [Title VII] if the alleged harassment alters, either explicitly or constructively, the terms or conditions of an individual's employment." <u>Curry v. District of Columbia</u>, 195 F.3d 654, 659 (D.C. Cir. 1999).  "Courts describe a constructive alteration as 'hostile work environment' harassment."  <u>Id.</u> (quoting <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 752 (1998)).  To be actionable, a hostile work environment must be "severe or pervasive."  <u>Curry</u>, 195 F.3d at 659 (citing <u>Burlington Indus., Inc.</u>, 524 U.S. at 752; <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 118 (1998)).  Moreover, an employer's liability for a hostile work environment racial harassment claim "differs depending on who does the harassing."  <u>Curry</u>, 195 F.3d at 659.  In instances of alleged co-worker harassment, "[a]n employer may be held liable for the harassment of one employee by a fellow employee (a non-supervisor) if the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action."  <u>Id.</u> at 660.

     The Court will assume, solely for the sake of argument, that the plaintiff's allegations constitute a work environment in which harassing conduct was severe and pervasive.  The Court

is making this assumption only for the purpose of reaching the ultimate element that must be satisfied in order for an employer to be liable in a co-worker harassment case—whether the employer knew or should have known of the harassment, and whether the employer's ameliorative actions were prompt and appropriate.  See Wilson v. Moulison N. Corp., 691 F. Supp. 2d 232, 236 (D. Maine 2010) (assuming that the plaintiff had satisfied the essential elements of a hostile environment claim and evaluating only whether the plaintiff had shown that there was some basis for employer liability).  Here, because the record is clear that the plaintiff brought only one instance of the alleged racial harassment to the attention of the defendant, and because the defendant reacted immediately to remedy the harassment and prevent future harassment, even if the plaintiff was indeed subjected to a work environment in which racial harassment was severe and pervasive, the defendant cannot be held liable.

Although the plaintiff's complaint and affidavit recount numerous instances of other staff attorneys using racially charged language, the record is clear that she brought only one of these events to the attention of the defendant.   Indeed, the plaintiff's March 23, 2006 e-mail to Pat Davies framed the "challenge" she faced as one of "shar[ing] a room with a group of people who talk incessantly."  Def.'s Mot., Ex. A at 54 (March 23, 2006 Davies e-mail chain).  She characterized that chatter as "often . . . benign," before describing the Wikipedia incident as "one unfortunate occasion."  Id.  The plaintiff continued, pointing to a "really troublesome situation," but that situation was the fact that some staff attorneys had "figured out a quicker way to code documents" that they had not shared with her, not anything regarding racial harassment.  Id. While this e-mail can easily be viewed as a complaint from the plaintiff to Pat Davies about the Wikipedia incident, it cannot be read as raising a complaint concerning all of the other alleged incidents when racially charged comments were allegedly made in the staff attorney room.  See

Def.'s Mot., Ex. A at 19 (Young Depo. 84:18-85:1) ("Q. All right.  But you don't in this e-mail

tell us about any other incidents that you found particularly offensive; do you? A. No.  Q.  Just

the one; right?  A.  Yes.").

Moreover, although the plaintiff maintains that she also complained about staff attorney

conduct to a female manager at Covington, Ms. Turner, the Court has three concerns about

accepting these alleged discussions as complaints.  First, the plaintiff, despite asserting that she

had "ongoing" discussions with Ms. Turner in March 2006, October 2006, and "all throughout,"

Def.'s Mot., Ex. A at 9 (Young Depo. 42:20-43:15), seemingly has difficulty recalling Ms.

Turner's first name.  See supra, note 5.  This difficulty suggests that perhaps these conversations

were not as frequent as the plaintiff would have the Court believe, a conclusion bolstered by the

fact that although the plaintiff contends that some of her "discussions" with Ms. Turner occurred

"via e-mail," the record is entirely devoid of any e-mail correspondence between the plaintiff and

Ms. Turner.  Nor has the plaintiff offered deposition testimony or an affidavit from Ms. Turner.

Second, the plaintiff's deposition testimony indicates that she did not anticipate that Ms. Turner

would remedy the problems she brought to Ms. Turner's attention.  Def.'s Mot., Ex. A at 9-10

(Young Depo. 44:20-45:4).  Indeed, the plaintiff's concession that the staff attorney conduct was

discussed with Ms. Turner during friendly conversation seemingly indicates that the plaintiff

herself did not, at the time, view these discussions as complaints.  See id. at 10 (Young Depo

45:5-11).  Third, and most important, although Ms. Turner advised the plaintiff to talk to Pat

Davies about her concerns regarding staff attorney conduct, id. at 9 (Young Depo. 43:21-44:7),

the record makes clear that the plaintiff did not do so.  Id. 9-10 (Young Depo. 50:13-53:21).  The

Court thus finds that the plaintiff's self-serving, uncorroborated, and conclusory allegations that

her discussions with Ms. Turner amount to complaints are insufficient to demonstrate "a triable

issue of fact."  Pub. Citizen Health Research Grp., 185 F.3d at 908.

      Having found that Covington had notice of the Wikipedia incident, the Court must now

examine the promptness and appropriateness of Covington's remedial action.  "'Factors in

assessing the reasonableness of remedial measures may include the amount of time that elapsed

between the notice and remedial action, the options available to the employer, possibly including

employee training sessions, transferring the harassers, written warnings, reprimands in personnel

files, or termination, and whether or not the measures ended the harassment.'"  Curry, 195 F. 3d at

662 n.17 (quoting Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999)).  The record

shows that Mr. Davies took immediate action to investigate and remedy the plaintiff's complaint

as expressed to him in the March 23, 2006 e-mail.  Specifically, Mr. Davies responded to the

plaintiff's e-mail six minute later, asking to speak with the plaintiff immediately.  Def.'s Mot.,

Ex. A. at 54 (March 23, 2006 Davies e-mail chain).  As the defendant points out, "although [the]

plaintiff had waited 105 days [from December 9, 2005 to March 23, 2006,] to make her

complaint, Davies initiated an investigation six minutes after [the] plaintiff sent him her [e-

mail]."  Def.'s Mem. at 12.  "Within hours," id., Mr. Davies met with staff attorneys Sarah Wittig

and Heidi Riviere.  He made clear to the plaintiff that he was prepared to terminate Ms. Wittig's

employment with Covington, and chose a different course of remedial action only when the

plaintiff begged him not to fire Wittig. Def.'s Mot., Ex. C at 5 (Davies Depo. 18:19-19:9).  Upon

the plaintiff's insistence that he merely move her to a different work room, Mr. Davies moved

Ms. Wittig to a new work space by the end of the day.  Id.  The next day, Mr. Davies reiterated

the firm's anti-harassment policy to all of the staff attorneys and advised them that harassment

would not be tolerated.  Although the plaintiff now attempts to portray Mr. Davies' reference to

his childhood pet monkey as diminishing the seriousness of the warning and as further evidence of harassment, the record illustrates that when she left the March 27, 2006 staff attorney meeting, the plaintiff viewed Mr. Davies' talk as a "warning." See Def.'s Mot., Ex. M at 13 (Declaration of Kimberly Ball, Ex. D (March 27, 2006 e-mail chain between Yolanda Young and Patrick Davies)).  The plaintiff's March 27, 2006 e-mail to Mr. Davies reflects her belief that other staff attorneys did not take Mr. Davies' warning "seriously," but it included no mention of the pet monkey story or that she viewed Mr. Davies' admonition as inappropriate or harassing. Id. at 13-14.  In short, this e-mail focuses on the conduct of the other staff attorneys after the March 26, 2006 meeting, not Mr. Davies' conduct at the meeting itself, and the plaintiff's current attempt to portray Mr. Davies' story as harassing is little more than a self-serving, conclusory allegation. Pub. Citizen Health Research Grp., 185 F.3d at 908.  Finally, Mr. Davies invited the plaintiff to "talk with [him] anytime to offer further explanation" concerning the "hostile . . . environment" she believed had been created in the staff attorney work room. Id. at 13.  The plaintiff never did so, either with Mr. Davies or with anyone else at Covington. Def.'s Mot., Ex. A at 11-12 (Young Depo. 50:13-53:21)

Covington "had in place a policy against harassment, it had made its policy known . . . [,] it had established an effective complaint procedure [and therefore] was entitled to rely on its employees to bring problems with their co-workers to its attention." Curry, 195 F.3d at 661. Moreover, the record before the Court confirms that Covington responded promptly and appropriately to the one instance of alleged harassment that the plaintiff brought to the defendant's attention.  Accordingly, the defendant cannot be held liable for the racial harassment that she contends she was subjected to by her coworkers.

2.  <u>The Disparate Treatment Discrimination Claim</u>

Next, the plaintiff claims that Covington "had no legitimate business reason for treating [her] differently from her white coworkers."  Am. Compl. ¶ 134.  This claim seems to stem from an allegation set forth earlier in the complaint that "a white associate had given certain document-coding training to only the white staff attorneys in the workgroup to which [the p]laintiff belonged."  <u>Id.</u> ¶ 35*l*.  The District of Columbia Circuit "requires a plaintiff to state a prima facie claim of discrimination by establishing that: '(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'"  <u>Stella v. Mineta</u>, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting <u>Brown v. Brody</u>, 199 F.3d 446, 452 (D.C. Cir. 1999)).

Here, the plaintiff's claim of discriminatory treatment fails because the record is clear that the plaintiff did not suffer an adverse employment action in the form of denied training.  <u>See</u> <u>Richard v. Bell Atlantic Corp.</u>, 209 F. Supp. 2d 23, 35 (D.D.C. 2002) (ruling against the plaintiff who had alleged a discriminatory denial of training because the plaintiff had failed to provide "concrete examples or evidence to support her allegations").  The plaintiff cannot show any instances of training that she sought and that Covington denied; in fact, the record reveals the opposite.  On March 23, 2006, the plaintiff sent an e-mail to Ms. Reid expressing a coding question:

> Caroline, How do I pre code my name in a group of documents?  I just heard another [staff attorney] say to someone else that this seems to have saved a considerable amount of time, but I don't know how to do it and as I have said before, we are not good about sharing information down here.

Def.'s Mot., Ex. A at 50 (March 23, 2006 e-mail chain between Yolanda Young and Caroline Reid ("March 23, 2006 Reid e-mail chain")).  Two minutes later, Ms. Reid responded and invited the plaintiff to her office so that she could answer the plaintiff's question.  <u>Id.</u>; Def.'s Mot., Ex. A

at 16 (Young Depo. 69:2-70:20).  The plaintiff's deposition testimony demonstrates that Ms.

Reid gave the plaintiff the requested training the very same morning she requested it.  Def.'s

Mot., Ex. A at 16 (Young Depo. 72:14-16) ("Q. And indeed when you got to her office she

showed you how to do it; correct? A. Correct.").  Furthermore, the plaintiff has not shown that

the similarly situated white staff attorneys were provided the coding technique by anyone at

Covington, acknowledging only that the other staff attorneys had "gotten somehow some

information." Id. at 15 (Young Depo. 67:9-13).  Quite simply, then, there is no genuine issue of

material fact regarding whether the plaintiff suffered an adverse employment action by having

been denied training because no such denial occurred.  Accordingly, the plaintiff's claim that

Covington treated her differently because of her race in denying her training that was provided to

white staff attorneys fails as a matter of law.

> D.  The plaintiff's retaliation claim (Count IV)

Title VII's anti-retaliation provision "forbids employer actions that discriminate against

an employee (or job applicant) because [she] has opposed a practice that Title VII forbids."

Burlington N. & Santa Fe R.R. Co. v. White, 548 U.S. 53, 59 (2006).  In the absence of direct

evidence of retaliation, "[e]valuation of Title VII retaliation claims follows the same burden-

shifting template as discrimination claims." Holcomb v. Powell, 433 F.3d 889, 901 (D.C. Cir.

2006) (citing Cones v. Shalala, 199 F.3d 512, 520 (D.C. Cir. 2000)).  Under this framework, "a

plaintiff must [first] establish a prima facie case of retaliation; if she meets that burden, the

employer must articulate a legitimate nonretaliatory reason for its action; finally, the plaintiff has

the ultimate burden of establishing that the reason asserted by the employer is pretext for

retaliation." Holcomb, 433 F.3d at 901.

Following precedent set by the Supreme Court in <u>U.S. Postal Serv. Bd. of Governors v.</u> <u>Aikens</u>, 460 U.S. 711 (1983), however, as the Court noted earlier, this Circuit has repeatedly held that, at the summary judgment stage in a case in which an employee has suffered an adverse employment action and the employer has asserted a legitimate, nondiscriminatory or nonretaliatory reason for that action, "the district court need not—<u>and should not</u>—decide whether the plaintiff actually made out a prima facie case," <u>Brady</u>, 520 F.3d at 494; <u>see also</u> <u>Aikens</u>, 460 U.S. at 715 ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant."); <u>Jones v. Bernanke</u>, 557 F.3d 670, 678 (D.C. Cir. 2009) (explaining that <u>Brady</u>'s instruction that the district court should not examine whether a plaintiff has made out a prima facie case "appl[ies] equally to retaliation claims").  Rather, in such circumstances, the Circuit has directed the district court to "resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non[]discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on [a prohibited basis]?" <u>Brady</u>, 520 F.3d at 494.  "Of course, consideration of this question requires [the court] to evaluate all of the evidence before [it], including the same evidence that a plaintiff would use to establish her prima facie case," <u>George v. Leavitt</u>, 407 F.3d 405, 412 (D.C. Cir. 2005) (citing <u>Teneyck v. Omni Shoreham Hotel</u>, 365 F.3d 1139, 1151 (D.C. Cir. 2004)), but only in "exceptional circumstances" may "a plaintiff's prima facie case . . . on its own, suffice to defeat the proffer's presumption of validity and thus render summary judgment improper." <u>Woodruff v. Peters</u>, 482 F.3d 521, 530 (D.C. Cir. 2007).

Here, the plaintiff alleges that the defendant retaliated against her for raising claims concerning racial discrimination by "denying her a bonus, terminating her employment, and refusing to rehire her."  Am. Compl. ¶ 140.  She further asserts that Mr. Davies and Ms. Reid retaliated against her by accusing her of overbilling.[11]  Young Aff. ¶¶ 164-166; Am. Compl. ¶¶ 81-82.  Because the defendant has asserted legitimate, nonretaliatory reasons for all of the actions upon which the plaintiff bases her claim of retaliation, the Court need only assess whether the plaintiff has produced sufficient evidence from which a reasonable jury could conclude that the reasons offered by the defendant for its actions are pretext for what was actually unlawful retaliation.  And it is quite clear that she has not done so.

As an initial matter, it is not apparent from the plaintiff's allegations or the entire record how the plaintiff was "denied" a bonus.  The only bonuses discussed in the record are the $9,000 bonus the plaintiff received in 2006 and the $5,000 bonus she received in 2007.  See, e.g., Young Aff. ¶ 185.  It is thus evident that the plaintiff was given a bonus in 2007, albeit a lower bonus than she had received the preceding year.  However, the defendant has explained that it used different criteria for making bonus decisions in 2007 than it did in 2006.  Def.'s Mem. at 23-24. Under the revised 2007 criteria, because the plaintiff "did not receive any high ratings her bonus of $5,000 fell at the low end of the spectrum."  Id. at 24.  The plaintiff has not introduced any evidence from which a reasonable jury could conclude that this proffered reason for the

---

[11]    The plaintiff's First Amended Complaint contains a handful of other allegedly retaliatory actions.  See, e.g., Am. Compl. ¶¶ 75-76 (claiming that being moved to a new office adjacent to Sarah Wittig's office was "punishment for having complained"); Young Aff. ¶ 189 (alleging that Patrick Davies humiliated the plaintiff by admonishing her for sending a firm-wide e-mail regarding sporting tickets).  The Court, however, will not address these actions, as it is indisputable that they are not adverse employment actions.  See Holcomb, 433 F.3d at 902 (noting that cases in this Circuit "have established some limits to what constitutes an adverse employment action," and instructing that "'purely subjective injuries,' such as dissatisfaction with a reassignment, public humiliation, or loss of reputation, are not adverse actions, the threshold of which is met when an employee 'experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'" (quoting Forkkio v. Powell, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002)); see also Burlington Northern, 548 U.S. at 67-68 (adopting the District of Columbia Circuit's "material adversity" standard for retaliation claims).

plaintiff's reduced 2007 bonus is actually pretext for unlawful retaliation.  Moreover, the Court's own review of the record reveals that it is devoid of any evidence from which a reasonable jury could conclude that the defendant's reason—a different bonus criteria and the plaintiff's unremarkable evaluations on the basis of that criteria—was not the real reason for the $5,000 bonus the plaintiff received in 2007.

The defendant's asserted, nonretaliatory reason for terminating the plaintiff's employment in 2007 is twofold: first, in July 2007, it concluded that it should reduce the number of staff attorneys given an "ebb in their workload," Def.'s Mem. at 25; and second, after the defendant solicited reviews from associates who had worked with staff attorneys to aid the determination of which staff attorneys should be released, the plaintiff "ranked at the bottom of the list in terms of performance ratings."  Id. at 26.  The former element of the termination decision is not only unchallenged by the plaintiff, but is corroborated by her deposition testimony.  See Def.'s Mot., Ex. A at 33 (Young Depo. 153:18-21) ("Q. Okay.  Now, Ms. Young, you recall that in the months preceding your termination there was a slow down of work at the firm?  A. Yes.").  And the plaintiff has not introduced any evidence from which a reasonable jury could conclude that the second component of the termination decision was applied to the plaintiff in a discriminatory or retaliatory manner.  Indeed, the Court's own review of the record discloses that the three attorneys who ranked the plaintiff's performance prior to her termination, Brian Buelich, David Garr, and Matt Watkins, see Def.'s Mot., Ex. E at 9 (Maloney Depo. 31:17-18; 40:13-16), were unaware of the plaintiff's complaint to Mr. Davies about the Wikipedia incident or any of her other allegations of discriminatory conduct that had been made by the plaintiff.  To be sure, the fact that the plaintiff concededly never reported the majority of the purportedly discriminatory and harassing conduct to anyone at Covington, see supra at 11, bolsters the defendant's assertion

that the three reviewing attorneys could not have been influenced by "unlawful considerations." Def.'s Mem. at 26.  Accordingly, there is no evidence in the record from which a reasonable jury could conclude that the defendant's asserted reasons for the plaintiff's termination were not the true reasons and were, in fact, pretext for unlawful retaliation.

The defendant asserts that it rejected the plaintiff's application for reemployment in March 2008, because it had no available positions.  Id. at 27.  Although the plaintiff maintains that Covington did rehire staff attorneys and had retained the services of a legal recruiter to recruit staff attorneys, see Pl.'s Opp'n at 4, ¶ H1; Young Aff. ¶ 196, she has not provided any evidence to support these assertions.  And it is clear that a party opposing summary judgment cannot prevail on "mere allegations or denials," Burke, 286 F.3d at 517 (quoting Anderson, 477 U.S. at 248) (internal quotation marks omitted), because "conclusory allegations unsupported by factual data will not create a triable issue of fact," Pub. Citizen Health Research Grp., 185 F.3d at 908 (internal brackets and quotation marks omitted).  The plaintiff has therefore not introduced any evidence from which a reasonable jury could conclude that the defendants' stated reason for its refusal to rehire the plaintiff was not the real reason for the defendant's decision.

Finally, the defendant has asserted that its scrutiny of the plaintiff's billing records in October 2006 was appropriate and justified to ensure that clients would not be billed for time that was not actually worked.  Def.'s Mem. at 25.  Mr. Davies e-mailed the plaintiff after she "had billed [eleven] hours of work on a weekend day, and had started recording billable time before she actually entered the building on seven days in a two-week period."  Id. at 24 (emphasis in original); see also Def.'s Mot., Ex. M at 576 (Ball Decl., Ex. H (October 17, 2006 e-mail chain between Yolanda Young and Patrick Davies)).  When Mr. Davies brought his concerns about the billing period in question to the plaintiff's attention, he reiterated the billing policy for the project

on which she was staffed, acknowledged that mistakes do occur, and made clear that he was not accusing her of deliberate wrongdoing.  Def.'s Mot., Ex. M. at 576-577 (Ball Decl., Ex. H (October 17, 2006 e-mail chain between Yolanda Young and Patrick Davies)).  The plaintiff replied by committing to be "more precise in [her] billing in the future," and stating that she would not work from home in the future.  Id. at 576.  The record therefore indicates that the defendant had a legitimate reason for raising questions about the plaintiff's billing for this particular period—that her billing contravened the billing procedures that had previously been communicated to her.  Additionally, and more important at this juncture, the plaintiff has provided no evidence from which a reasonable jury could conclude that the defendant's stated reason was not the true reason that the defendant brought its concerns to the plaintiff's attention and thereafter corrected her billing records.

A review of some of the District of Columbia Circuit's recent Title VII retaliation decisions confirms the inadequacies of the plaintiff's retaliation claim.  While it has not established a bright-line test for assessing temporal proximity, see Hamilton v. Geithner, 666 F.3d 1344, 1357-58 (D.C. Cir. 2012) (observing that although the Supreme Court has cited cases suggesting that in "some instances a three-month period between the protected activity and the adverse employment action may, standing alone, be too lengthy to raise an inference of causation, neither the Supreme Court nor [the District of Columbia Circuit] has established a bright-line three-month rule"), the Circuit has paid close attention to the lapse of time between the protected conduct and the allegedly retaliatory employment action, see Jones, 557 F.3d at 679 (explaining that simply because "temporal proximity evidence" is typically used to show causation at the prima face stage does not preclude this factor from being considered when the court must resolve the question of "retaliation vel non").  For example, in Hamilton, the Circuit

38

concluded that when measured from the filing of the plaintiff's formal complaint, as opposed to

solely the date of his EEO counseling, the "period between his statutorily procted activity and the

adverse employment action [was] just under three months."  666 F.3d at 1358.  Unlike in

Hamilton, however, the plaintiff here did not file a formal complaint with the EEOC until after

her employment with the defendant had concluded.  See Am. Compl. ¶ 9 (stating that the

plaintiff filed a charge of discrimination with the EEOC on June 13, 2008).  Accordingly, the

filing of the formal EEOC complaint cannot be a starting point for the temporal proximity

analysis in this case.  Cf. Hamilton, 666 F.3d at 1358 (explaining that "courts should consider

later protected activity in determining whether evidence of temporal proximity satisfies the

causation element").  Thus, the only statutorily protected activity from which temporal proximity

can be measured is the plaintiff's March 23, 2006 e-mail to Patrick Davies and her discussion

with him that same day, in which she complained about the Wikipedia incident.  And the

allegedly retaliatory actions taken against the plaintiff all occurred well after March 23, 2006: the

overbilling accusations in October 2006, Young Aff. ¶ 161; the bonus "denied" in February

2007, id. ¶ 185; the termination in August 2007, id. ¶ 191; and the refusal to rehire in March

2008, id. ¶ 195.  Here, then, the purportedly retaliatory actions were taken four months, eleven

months, sixteen months, and twenty-four months, respectively, after the plaintiff's protected

activity.  It is therefore clear that the adverse actions did not take place "shortly after," Holcomb,

433 F.3d at 903, the protected activity, and that the timing of the allegedly retaliatory actions

alone does not provide a basis from which a reasonable jury could conclude that the defendant's

asserted reasons for taking the challenged actions were pretext for retaliation.  See Hamilton, 666

F.3d at 1359 (explaining that even in instances of temporal proximity between the protected

activity and the allegedly retaliatory action, it must be "[kept] in mind that 'positive evidence

beyond mere proximity is required to defeat the presumption that the [employer's] proffered explanations are genuine.'" (quoting Woodruff, 482 F.3d at 530)).

The Circuit has also focused on the role that knowledge by an employer of the plaintiff's statutorily protected activity necessarily plays in the retaliation vel non analysis. See Jones, 557 F.3d at 679 ("To survive summary judgment, . . . Jones needn't provide direct evidence that his supervisors knew of his protected activity; he need only offer circumstantial evidence that could reasonably support an inference that they did."). In Talavera v. Shaw, 638 F.3d 303 (D.C. Cir. 2011), for instance, the court found that the plaintiff's failure to show that the individual making promotion decisions (Randy Streufert) possessed knowledge of her protected activity was critical to whether her retaliation claim survived the defendant's summary judgment motion. Id. at 313. There, the plaintiff had applied for a promotion in the division of the USAID Office of Security in which she had worked for twenty-two months. Id. at 307. She was selected for an interview, which was conducted by Streufert. Id. During the same time period, she told her immediate supervisor, Gaylord Coston, and the division head of a different division, David Blackshaw, that she was filing an EEO complaint in regard to having previously been referred to a mental health screening "(that never took place)" for clearance to serve in Iraq. Id. After the plaintiff was not selected for the promotion, she claimed that her nonpromotion was retaliation for the EEO complaint premised upon the mental health screening referral. Id. In assessing this claim, the Circuit reasoned that "[t]o prove unlawful retaliation [the plaintiff-appellant] had to show that Streufert, who made the promotion selection, had knowledge of her protected activity." Id. at 313. The plaintiff merely asserted that Streufert worked closely, discussed personnel matters, and "hung out" frequently with Coston and Blackshaw, id. and that Streufert thus "must also have known" that she filed an EEO complaint, id. The Circuit rejected this

contention, finding that the plaintiff-appellant had "offered no evidence" that Coston or

Blackshaw had revealed the mental health referral to anyone other than the treating physician,

and that her claim that Streufert had knowledge of the referral required a "speculative leap." Id.

Here, the plaintiff's retaliation claim suffers from similar gaps in the chain of knowledge with

regard to her protected activity.  While the plaintiff complained to Mr. Davies, she was

ultimately terminated by Kathleen Maloney and a human resources representative.[12]  See Young

Aff. ¶ 191; see also Def.'s Mot., Ex. C at 41 (Davies Depo. 215:1-11) (explaining that Ms.

Maloney determined which eight staff attorneys should be terminated).  The plaintiff has not

asserted, much less introduced evidence tending to show, that Ms. Maloney had any knowledge

of the Wikipedia incident or her conversation with Mr. Davies regarding that event.

Accordingly, a conclusion that Ms. Maloney's recommendation that the plaintiff be one of the

eight staff attorneys terminated in August 2007 was based on her knowledge of the plaintiff's

March 2006 complaint to Mr. Davies would require a "speculative leap" of the sort rejected in

Talavera.  638 F.3d at 313.

   Finally, in evaluating retaliation claims, the Circuit has assessed the credibility and

reliability of the evidence supporting the employer's asserted legitimate, nonretaliatory reason.

See Geleta v. Gray, 645 F.3d 408, 413-14 (D.C. Cir. 2011) (noting first that the employer's

reasons for the allegedly retaliatory transfer in position had "changed over time," and, second,

that a reasonable jury could conclude that the employer's proffered reason was "itself not

credible"); Pardo-Kronemann v. Donovan, 601 F.3d 599, 605 (D.C. Cir. 2010) (agreeing with the

plaintiff-appellant that he had provided evidence calling into question his former supervisor's

---

[12]   There are inconsistencies in the record regarding the name of the human resources representative.  The plaintiff identifies the human resources representative as Nisa Walls, Young Aff. ¶ 191, while the defendant identifies her as Neesa Wallace, Def.'s Mot., Ex. C at 42 (Davies Depo. 218:15).  The record also contains a reference to Lisa Walls.  Def.'s Mot., Ex. E at 8 (Maloney Depo. 28:15).

credibility, "and therefore the legitimacy of . . . the proffered reason" for the adverse action).
Here the plaintiff has neither directly challenged the credibility of Mr. Davies, Mr. Huvelle, Ms.
Maloney, or any of the defendant's other witnesses, nor has she produced any evidence from
which a reasonable jury could draw adverse inferences about the credibility or reliability of their
testimony.  Accordingly, the plaintiff's retaliation claim is distinguishable from those found to
have sufficient merit to survive summary judgment in Geleta and Pardo-Kronemann.

As the foregoing demonstrates, the plaintiff's retaliation claim fails.  The defendant has
asserted a legitimate, nonretaliatory reason for every allegedly retaliatory adverse employment
action the plaintiff claims she was subjected to.  The plaintiff, in turn, has failed to rebut any of
the defendant's asserted reasons with evidence from which a reasonable jury could conclude that
the defendant's reasons were  not its true reasons for its allegedly retaliatory actions.
Accordingly, the defendant is entitled to judgment as a matter of law on the plaintiff's retaliation
claim.

E.  The plaintiff's wrongful termination claim (Count V)

In Count V of the First Amended Complaint, the plaintiff claims that the defendant
"terminated [her employment] on the basis of her race and/or because she opposed the
discrimination to which it subjected her in violation of Title VII, § 1981, and the DCHRA."  Am.
Compl. ¶ 145.  She further maintains that the "[d]efendant had no legitimate business reason to
terminate" her employment.  Id. ¶ 146.  This claim is duplicative of the plaintiff's retaliation
claim and suffers from the same deficiencies; namely, she has provided no evidence calling into
question the defendant's stated reason for her termination that would permit a reasonable jury to
conclude that she was treated less favorably because of her race.  Accordingly, summary
judgment is awarded to the defendant on the plaintiff's wrongful termination claim.

F.  <u>The plaintiff's claim of discriminatory subterfuge (Count VI)</u>

In Count VI of the First Amended Complaint, the plaintiff claims that the defendant, "in violation of the DCHRA, took the discriminatory and retaliatory actions against [her] for reasons that would not have been asserted but for, wholly or partially, a discriminatory reason based on [her] race."  Am. Compl. ¶ 150.  The DCHRA provides that it is unlawful for an employer to fail or refuse to hire, or to otherwise discriminate against any individual, "wholly or partially for a discriminatory reason based upon the actual or perceived" race of that individual.  DC Code § 2-1402.11.  In a subsection entitled "subterfuge," the DCHRA continues: "[i]t shall further be an unlawful discriminatory practice to do any of the [prohibited] acts for any reason that would not have been asserted but for, wholly or partially, a discriminatory reason."  But, as the District of Columbia Court of Appeals has explained, "[b]ecause [the subterfuge] provision presupposes a discriminatory act which is alleged to have been committed by subterfuge, [a plaintiff's] claim under this heading necessarily fails upon the judgment against her on her claims for race . . . discrimination."  <u>McManus v. MCI Comms. Corp.</u>, 748 A.2d 949, 954 n.4 (D.C. 2000).  Thus, the deficiency of the plaintiff's race discrimination claim dooms her claim of discriminatory subterfuge.  The defendant is therefore entitled to judgment as a matter of law on Count VI.

## IV.  CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment will be granted. Accordingly, summary judgment is entered in favor of the defendant and against the plaintiff on the six remaining claims in this case: the plaintiff's discriminatory job assignment and promotion claims (Count I), the plaintiff's claim that the defendant's nonpromotion policy had a disparate impact on African-Americans (Count II), the plaintiff's claims of discriminatory treatment and harassment (Count III), the plaintiff's retaliation claim (Count IV), the plaintiff's claim of

wrongful termination (Count V), and the plaintiff's claim of discriminatory subterfuge (Count VI).[13]

REGGIE B. WALTON
United States District Judge

---

[13]     The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.